561 F.2d 293
 48 A.L.R.Fed. 866, 182 U.S.App.D.C. 295
 DELTA AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent*, Western
Air Lines, Inc., Northwest Airlines, Inc., Pan
American World Airways, Inc., Intervenors.
PAN AMERICAN WORLD AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Western Air Lines,
Inc., Northwest Airlines, Inc., Intervenors.
NATIONAL AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Western Air Lines,
Inc., Pan American World Airways, Inc., Northwest
Airlines, Inc., Intervenors.
AMERICAN AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Pan American World
Airways, Inc., Western Air Lines, Inc., Intervenors.
 Nos. 76-1241, 76-1309, 76-1429 and 76-1602.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 23, 1976.
Decided June 23, 1977.
As Amended Aug. 2, 1977.
 
 Robert Reed Gray, Washington, D. C., with whom James W. Callison, Atlanta, Ga., and Louis Hayner Kurrelmeyer, Washington, D. C., were on the brief, for petitioner in No. 76-1241.
 James F. Bell, Washington, D. C., with whom Richard D. Mathias and Joseph M. Oliver, Jr., Washington, D. C., were on the brief, for petitioner in No. 76-1309 also entered appearances for intervenor, Pan American World Airways, Inc.
 Bert W. Rein, Washington, D. C., with whom Jon Paugh and Edwin O. Bailey, Assoc. Gen. Counsel, Washington, D. C., were on the brief for petitioner in No. 76-1429.
 J. William Doolittle, Jr., Washington, D. C., for petitioner in No. 76-1602. Alfred V. J. Prather, Ky P. Ewing, Jr. and Carl B. Nelson, Jr., Washington, D. C., were on the brief for petitioner in No. 76-1602.
 Alan R. Demby, Atty., C. A. B., Washington, D. C., with whom James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert L. Toomey, Thomas L. Ray, Attys., C. A. B., Carl D. Lawson and Lee I. Weintraub, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent. B. Barry Grossman, Edward E. Lawson, Attys., Dept. of Justice, and Michael Stempler, Atty., C. A. B., Washington, D. C., also entered appearances for respondent.
 Emory N. Ellis, Jr., Washington, D. C., with whom Gerald P. O'Grady, Los Angeles, Cal., was on the brief, for intervenor, Western Air Lines, Inc.
 Ronald D. Eastman, Washington, D. C., entered an appearance for intervenor, Northwest Airlines, Inc.
 Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated records present the first occasion for judicial review of a matter which has already occupied the attention of the Civil Aeronautics Board for nearly ten years the award of competitive nonstop authority on the Miami-Los Angeles route. Of the various contentions pressed upon us by the several contending parties, only three warrant discussion in some detail:
 
 
 2
 1. The claim by Delta Air Lines, Inc., that it was entitled to priority by reason of its 1972 merger with Northeast Airlines, Inc.
 
 
 3
 2. The challenge by National Airlines, Inc., the incumbent monopoly carrier on the route, to the Board's alleged failure to comply with the Energy Policy and Conservation Act of 1975.
 
 
 4
 3. The contention (echoed by National) of Pan American World Airways, Inc., the carrier recommended for the route by the Administrative Law Judge but displaced at the Board level by Western Air Lines, Inc., that the Board unfairly took into account events occurring during the three-year interval between the closing of the record and the Board's decision.
 
 
 5
 We find no basis in either of the first two for disturbing the Board's action. The third, however, presents procedural problems which cause us to conclude that the record should be remanded to the Board for reconsideration after opportunity is afforded for adversarial inquiry into matters occurring after the closing of the record in 1973.
 
 
 6
 * On March 10, 1967 the Board initiated the Southern Tier Competitive Nonstop Investigation. The Miami-Los Angeles route was among the eighteen markets under consideration in that proceeding. Single carrier nonstop service between the two cities had originally been authorized in the Southern Transcontinental Service Case, 33 C.A.B. 701 (1961) (see also 14 C.F.R. § 202.11 (1976) ), and from 1961 until 1969 National enjoyed monopoly certification over the route.
 
 
 7
 The Board, in July, 1969, awarded competitive nonstop authority in the Miami-Los Angeles market to Northeast Airlines, Inc. "for route strengthening purposes." On petition for reconsideration, Eastern Airlines, Inc., a competing applicant, suggested that, given Northeast's comparatively weak financial posture, Northeast might be a likely candidate for a merger, and that, under such circumstances, the Board's solicitude for the welfare of Northeast's route structure might be ill-advised. In response, Northeast categorically assured the Board that no merger was contemplated. Apparently in reliance on this representation, the Board, without discussion, affirmed its award to Northeast in an order issued September 18, 1969. Six days later, Northeast decided to seek a merger. Meanwhile, on October 1, 1969, Northeast commenced nonstop service under its new authority.
 
 
 8
 Northeast's first prospective merger partner was Northwest Airlines, Inc. In August, 1970, after a public hearing, the Board's Examiner recommended that the proposed merger be approved, and that all of Northeast's certificates, including that which covered the Miami-Los Angeles route, be transferred to Northwest. The Examiner reached this result over the objections of Delta and another carrier, and despite his recognition that Miami-Los Angeles authority had only been granted to Northeast in an effort to counterbalance existing limitations in Northeast's route system. The Board itself was not quite so accommodating in its review of the proposed merger. Although conceding that the transaction would prove economically beneficial to both parties, and would entail no monopoly dangers, a three-member majority of the Board was unwilling to accept transfer of the Miami-Los Angeles authority without an opportunity to reconsider the route award in the light of post-merger circumstances. The December, 1970 order accompanying the Board's opinion approved the merger subject to the conditions
 
 
 9
 (a) that the authorization of Northwest Airlines to operate segment 7 of Northeast's certificate for Route 27 (Miami-Los Angeles) be stayed pending final decision in a proceeding for the purpose of reexamination of such authorization to be instituted upon transfer of the certificate, and (b) that the transferred certificate for Route 27 shall be subject to whatever determinations are made regarding segment 7 in such proceeding . . . .
 
 
 10
 Some of the Board's pertinent remarks are set forth in the margin.[1]
 
 
 11
 Northwest petitioned for reconsideration, but, in an opinion dated March, 1971, the Board remained steadfast in its refusal to permit transfer of the Miami-Los Angeles route. One factor influential in stiffening the Board's resolve was Delta's expressed willingness to merge with Northeast "whether or not the Miami-Los Angeles segment is transferred to Delta as part of the merger." Rather than proceed in accordance with the restrictions imposed by the Board, Northwest withdrew from the prospective merger. In May, 1971, Northeast and Delta entered into a merger agreement, and another hearing was held by the Board; and, in October, 1971, the Examiner recommended that the merger be approved subject to certain conditions, including a stay of authority to operate the Miami-Los Angeles route pending completion of a section 401(g) proceeding.[2] With minor variations not relevant here, the Board in May of 1972 concurred in the Examiner's recommendations. The language in that order referring to the Board's treatment of the Miami-Los Angeles route was essentially identical to that employed on the same subject in connection with the proposed Northwest merger. See text accompanying note 1 supra. Petitions for reconsideration raising issues unrelated to the present controversy were denied, and the Delta-Northeast merger finally approved, in July, 1972. On July 31, Northeast terminated its Miami-Los Angeles service, and National once again became a monopoly carrier between the two cities.
 
 
 12
 Approximately three weeks later, the Board, honoring its commitment to undertake a post-merger reevaluation of the Miami-Los Angeles market, instituted an investigation designated as the Miami-Los Angeles Competitive Nonstop Case. The stated purpose of this investigation was
 
 
 13
 to determine whether the public convenience and necessity require (a) the alteration, amendment, or modification of any carrier certificates so as to authorize nonstop service . . . between Miami-Fort Lauderdale, Fla., and Los Angeles-Ontario-Long Beach, Calif., and (b) the alteration, amendment, or modification of Delta Air Lines' certificate for route 27 so as to suspend, terminate, or otherwise modify authority to operate over segment 7.
 
 
 14
 An expedited hearing was scheduled, and on June 13, 1973, the ALJ issued his decision, finding a continuing need for nonstop competition on the Miami-Los Angeles route, and authorizing Pan American to provide the necessary service. On June 19, 1973, the Board, on its own initiative, granted discretionary review of the ALJ's determination.
 
 
 15
 The first delay encountered was precipitated by National's contention that certification of a nonstop competitive carrier "would constitute a major Federal action significantly affecting the quality of the environment," and would therefore require a detailed environmental statement under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq. (1970). The ALJ rejected this position, and the Board purportedly followed suit in an order dated September 27, 1973. However, despite its belief that further formal exploration of environmental questions was not statutorily required, the Board announced its intention to accord such matters a thorough airing, and therefore instructed the Director of the Board's Bureau of Operating Rights "to prepare a statement with respect to the environment for consideration and comment by the parties, other environmentally concerned Federal agencies, and other interested persons." A preliminary draft of this environmental assessment was not completed until August, 1974, and the final version did not become available until the following December. Meanwhile, all other proceedings in the Miami-Los Angeles Competitive Nonstop Case were deferred pending completion of the environmental study. The Bureau's ultimate conclusion matched that reached eighteen months earlier by the ALJ, namely, that
 
 
 16
 the award of a certificate of public convenience and necessity authorizing nonstop air transportation between Miami-Ft. Lauderdale and Los Angeles-Ontario-Long Beach to one of the nine applicants, and the commencement of operations by the carrier selected, would not constitute a "major Federal action significantly affecting quality of the human environment" within the meaning of section 102(2)(c) of the National Environmental Policy Act of 1969.
 
 
 17
 J.A. 717. No party has challenged this conclusion before either the Board or this court.[3]
 
 
 18
 Oral argument was finally heard by the Board on April 16, 1975. Eleven months passed before the Board, on March 15, 1976, issued its decision, affirming the ALJ's finding of a need for competition on the Miami-Los Angeles route, but reversing his award of operating authority to Pan American, and certifying Western instead. At the same time, the Board denied a January, 1976 motion by National to postpone further action until after preparation of a statement under the EPCA estimating "the probable impact on energy efficiency and energy conservation of nonstop competitive authority in the Miami-Los Angeles market." Also denied in March, 1976 was a November, 1974 motion by Continental to reopen the record on the ground that changes in circumstances occurring since the close of economic hearings undermined the evidentiary basis for the ALJ's selection of Pan American, and made profitable operation of the Miami-Los Angeles route by Pan American unlikely.
 
 
 19
 Pan American had opposed the motions of both National and Continental. However, on the morning of March 15, 1976, only hours before the Board's decision was released, Pan American itself filed a motion to reopen the record for further evidentiary presentations. This motion to reopen was denied, and, on June 16, the Board promulgated an order rejecting various petitions for reconsideration and denying requests for a stay of the award pending judicial review. Such a stay was similarly denied by a motions panel of this court on July 2, 1976, but with directions for expedited hearing on the merits.
 
 II
 
 20
 Delta has attempted to persuade us of its entitlement to preferential treatment. Unimpressed by any of the theories advanced, and convinced that Delta had agreed, as one of the conditions of Board approval of the Delta-Northeast merger, to compete on an equal footing with other applicants for Miami-Los Angeles authority, we affirm the Board in its rejection of Delta's claims to special status.
 
 
 21
 During the Examiner's review of the proposed Northwest-Northeast merger in 1970, Delta urged that, whatever the Board's conclusion as to the overall advisability of the merger, in no event should the Miami-Los Angeles segment of Northeast's Route 27 be transferred to Northwest as part of the deal.[4] Criticizing what it characterized as Northeast's "emotional plea" for route strengthening in the Southern Tier investigation, the success of which was followed immediately by Northeast's initiation of merger negotiations, Delta argued that, if transfer of Miami-Los Angeles authority were permitted, other financially weak carriers would be encouraged to seek route awards for use as merger "bait." Technical problems with respect to effectuating the nontransfer could be solved, Delta suggested, by inclusion of the following statement in the Board's order concerning the proposed merger:
 
 
 22
 Segment 7 of Northeast's Route 27 shall not be transferred to the surviving carrier. . . . (T)he actual amendment of the certificate for Route 27 to incorporate the restriction specified above cannot be accomplished until the outcome of a Section 401(g) proceeding to alter, amend, or modify the certificate with respect to the above-certificated authority. At the time of the transfer of the certificate for Route 27 to Northwest, however, we will stay those portions of Northeast's certificated authorizations which we have found would be inconsistent with the public interest to transfer to Northwest.
 
 
 23
 This language, although somewhat opaque, appears to contemplate transfer of the entire Route 27 certificate to Northwest, accompanied by an annotation to the effect that segment 7 itself would not be transferred and that authority to operate segment 7 would be stayed pending completion of the described § 401(g) proceeding.
 
 
 24
 The actual wording adopted by the Board (see text accompanying note 1 supra ) omitted any express declaration that segment 7 would not be transferred. Nevertheless, the intention of the Board to proceed substantially in the manner proposed by Delta was clear. Equally clear was the fact that Delta fully appreciated the import of the Board's formulation. As noted previously, Delta, in opposition to Northwest's petition for reconsideration, sought to dispel potential Board fears that the perceived benefits of merger might be lost due to the conditions imposed by the Board. To this end, Delta announced its own desire to merge with Northeast "whether or not the Miami-Los Angeles segment is transferred to Delta as part of the merger." Moreover, Delta represented that, in the event the latter merger materialized, Delta would be "amenable to participating in a Section 401 proceeding vying for the (Miami-Los Angeles) authority along with other interested applicants."[5] In rejecting Northwest's petition, the Board declared its hope that Northwest would nevertheless proceed with the merger, but in no way suggested that, should the transaction go forward, Northwest would receive preferential treatment in the subsequent Miami-Los Angeles proceeding. Contrarily, the Board reminded Northwest of "the possibility of persuading the Board in the section 401(g) proceeding that the Miami-Los Angeles route should be permanently awarded to Northwest," but quickly cautioned that "(w)e intimate no views as to the outcome of that proceeding." Responding to a point raised by another carrier, the Board stated:
 
 
 25
 Braniff expresses concern that the Board's opinion might be construed as limited to modifications of the Northeast permit, without considering applications by other carriers for such route authority under section 401(b) of the Act. It was not our intention to so confine the contemplated proceeding.[6]
 
 
 26
 Thus, in March, 1971, at the close of the Board's examination of the proposed Northeast-Northwest merger, Delta had no reason whatever to believe that Northwest could assert any special claim to Northeast's Miami-Los Angeles authority if that merger actually took place.
 
 
 27
 Nothing occurred in the course of the Board's investigation of the proposed Delta-Northeast merger that can justify Delta in the conclusion that, after merger, Delta's status regarding the Miami-Los Angeles route is different from that which Northwest might have enjoyed had it pursued the Northeast deal to completion. Indeed, Delta has conceded on two separate occasions in its brief that the relevant conditions imposed by the Board on the Delta-Northeast merger are "in all significant respects identical to the conditions earlier imposed upon the Northwest-Northeast merger." Delta Brief at 15, 24.
 
 
 28
 Furthermore, during its consideration of the Delta-Northeast agreement, the Board plainly apprised Delta of the character of the planned proceeding on Miami-Los Angeles authority. First, in November, 1971, just a week after release of the Examiner's initial decision recommending approval of the Delta-Northeast merger subject to the restrictions outlined above, the Board issued an order in the Houston-Miami Phase of the Southern Tier Competitive Nonstop Investigation. Responding to this court's partial remand of the Board's original Southern Tier order (see Continental Air Lines v. CAB, 143 U.S.App.D.C. 330, 443 F.2d 745 (1971)), the Board directed that further evidentiary hearings be held on an expedited basis "on the issue of whether the public convenience and necessity require competitive nonstop service between Houston and Miami, and which carrier or carriers, if any, should be selected for such authority." In a footnote, the Board announced that it
 
 
 29
 reserve(d) the right at a later time to consolidate into the present proceeding the issue of competitive nonstop service in the closely related Miami-Los Angeles market, in the event that we approve the pending merger agreement between Delta and Northeast Airlines but find that the public interest requires that we stay the transfer of Northeast's Miami-Los Angeles route, also granted in the Southern Tier case, pending a section 401(g) proceeding to determine whether the route should be so transferred, should be awarded to a different applicant, or should be allowed to lapse. (Emphasis added.)
 
 
 30
 This description of the issues which might be considered in a proceeding subsequent to conditional approval of the Delta-Northeast merger was removed from the realm of speculation and formally repeated by the Board in its April, 1972 order and opinion ruling on the Delta merger. When proceedings in the current docket were instituted, the Board specifically identified the possibility that authority to operate the Miami-Los Angeles route would be deleted from the certificate transferred from Northeast to Delta. See text at 3 supra. At no point in all this did the Board even remotely suggest that, if Delta executed the merger with Northeast, Delta could expect primary ranking among applicants for Miami-Los Angeles authority.
 
 
 31
 Despite the foregoing, Delta has advanced a two-pronged argument drawn from the language of § 401(g) (see note 2 supra ) and supposedly supporting Delta's claim to a preferred position.[7] First, the carrier maintains that, regardless of the segment 7 designation employed by the Board in 1969 when appending Miami-Los Angeles authority to Northeast's existing Route 27 certificate, the award of such authority in reality constituted the grant of a new and separate certificate which, whether held by Northeast or Delta, could not be revoked absent a showing of "intentional failure to comply" with applicable statutes, rules, or regulations. Secondly, Delta contends that the Board's power under § 401(g) to alter, amend, or modify airline certificates has not historically been exercised to eliminate an entire major route over carrier objection, and that, even if the Board's power does extend far enough to permit such a termination, the requisite "public convenience and necessity" finding was not and could not have been made in this case.
 
 
 32
 We reject both parts of Delta's argument for essentially the same reason. The Miami-Los Angeles Competitive Nonstop Case was not an ordinary § 401(g) proceeding. Rather, it was convened in accordance with the Board's decision in the Delta-Northeast merger case. The Board's order instituting the Miami-Los Angeles investigation relied specifically not only on § 401(g), but also on § 408(b) of the Federal Aviation Act, 49 U.S.C. § 1378(b) (1970). The latter provision states that
 
 
 33
 Any person seeking approval of a consolidation, merger, purchase, lease, operating contract, or acquisition of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved in the consolidation, merger, purchase, lease, operating contract, or acquisition of control, and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the consolidation, merger, purchase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe . . . .
 
 
 34
 (Emphasis added.)
 
 
 35
 The factual context in which the Delta-Northeast merger occurred plainly demonstrates that Board approval was conditioned upon a stay of authority to operate the Miami-Los Angeles route, pending a fresh assessment of the need for competition in the Miami-Los Angeles market and of the relative merits of the various applicants for authority to serve that market. Thus, we find it unnecessary to consider the propriety of the Board's characterization of the Miami-Los Angeles route as a segment of a previously-existing certificate rather than as a new and separate certificate unto itself.[8]
 
 
 36
 Similarly, we need not evaluate Delta's contention that the Board's § 401(g) power to alter, amend, or modify certificates does not embrace the prerogative to eliminate an entire major route from a carrier's authority. Even if Delta's points were well taken with respect to § 401(g) proceedings generally, they completely ignore the fact that, under § 408(b), the Board may approve a merger "upon such terms and conditions as it shall find to be just and reasonable . . . ."[9] In this case, one of the terms imposed was a de novo consideration of the Miami-Los Angeles route award originally made to Northeast in 1969. If such a proceeding does not fall neatly within the mold of the ordinary § 401(g) proceeding, perhaps the Board should have been more circumspect about its use of the § 401(g) label. Since we can discern no obvious interrelationship between § 401(g) and § 408(b) in the statutory scheme of the Federal Aviation Act, we see no reason why the Board could not have omitted mention of § 401(g) altogether, and simply provided a brief description of the proceeding it proposed to conduct, pursuant to § 408(b), in connection with the Delta-Northeast merger.[10] While this may conceivably have been the preferable course for the Board to follow, its failure to do so did not prejudice Delta.
 
 III
 
 37
 We turn now to National's contention that the Board has not produced the energy impact statement contemplated by § 382(b) of the Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6362(b) (Supp. V 1976). Section 382(b) declares that five federal agencies, among them the CAB,
 
 
 38
 shall, where practicable and consistent with the exercise of their authority under law, include in any major regulatory action (as defined by rule by each such agency) taken by each such agency, a statement of the probable impact of such major regulatory action on energy efficiency and energy conservation.
 
 
 39
 In considering the application of this language to the Miami-Los Angeles route case, a brief comparison with relevant portions of the National Environmental Policy Act of 1969 (NEPA) may prove useful. As indicated above, the Board's Bureau of Operating Rights concluded, after a lengthy investigation, that NEPA did not require a formal environmental impact statement (EIS) in connection with the current proceedings, and that finding has not been questioned by the parties. This background is especially significant in view of NEPA's relatively rigid statutory scheme. Although § 382(b) of EPCA is reminiscent of NEPA's EIS requirement, at least two distinctions between the statutes are immediately evident. First, the statement required by EPCA is not described in the detail which Congress employed in prescribing the content of a formal EIS under NEPA. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1970), lists five subjects which must be specifically treated in every such environmental statement, and also admonishes that no such statement shall be prepared prior to consultation with other appropriate federal agencies. Secondly, under EPCA, the affected agencies enjoy greater flexibility, not just because of the less-structured format of the energy impact statement, but also because of the incorporation of a statutory safety valve making such a statement mandatory only where "practicable and consistent" with the exercise of agency authority under existing law.
 
 
 40
 Preliminarily, we note an important administrative development occurring since oral argument. On December 22, 1976, the Board published in the Federal Register proposed regulations implementing EPCA's command that the phrase "major regulatory action" be defined by each agency covered by Section 382.[11] 41 Fed.Reg. 56669-73 (1976) (to be codified in 14 C.F.R. § 313). We mention four salient features of these proposed regulations.
 
 
 41
 Although recognizing the arbitrary character of a quantitative standard (see id. at 56671), the Board, emphasizing ease of administration, has determined that particular conduct should qualify as "major regulatory action" if it
 
 
 42
 (m)ay cause a near-term net annual change in aircraft fuel consumption of 10 million (10,000,000) gallons or more, compared to the probable consumption of fuel were the action not to be taken;
 
 
 43
 or if it is "specifically so designated by the Board."[12] We observe in passing that the Board's Bureau of Operating Rights has calculated that, on an annual basis, Western's twice daily nonstop round-trip service between Miami and Los Angeles would consume 16.5 million gallons of fuel.
 
 
 44
 The second noteworthy aspect of the Board's proposed regulations is their extremely imprecise definition of "energy efficiency" as that term is used in § 382(b) of EPCA. If finally enacted, § 313.3(b) of the regulations would provide that
 
 
 45
 "Energy efficiency" means the ratio of the useful output of services in air transportation to the energy consumption of such services.
 
 
 46
 In commenting upon this proposed definition, the Board has sketched a variety of methods for measuring fuel efficiency, and has suggested, on the basis of recent experience, that none constitutes an entirely satisfactory approach under all circumstances. Therefore, the Board has declined "to be more specific or to render the definition in quantifiable terms at this time." Highly relevant in the present context are the Board's remarks with respect to the difficulties encountered in the use of comparative load factors as a means for assessing the impact of Board actions on energy efficiency:
 
 
 47
 (S)ome Board actions which on their face may be perceived to have detrimental impact on energy efficiency in the short run may in fact be intrinsically neutral or even beneficial. An example, in our view, is the certification of first competitive service. Historically, load factors in competitive markets have on the whole been lower than in monopoly markets. Moreover, it is generally although not universally the case that one consequence of the certification of a competitor in a monopoly market is to depress load factors in the short term, since neither normal traffic growth nor the new traffic often stimulated by new service is usually able to absorb the additional capacity introduced in the market in the first year of operations. In such an instance, it would appear that energy efficiency has suffered. However, over time there is no intrinsic reason why, at any given fare level, a competitive market cannot reach an equilibrium of demand and supply whereby market load factor returns to a reasonable level. Thus, reliance on forecast year comparisons of fuel efficiency may well be meaningless or even substantially misleading in the typical competitive route case.
 
 
 48
 Id. at 56672 (emphasis added).
 
 
 49
 Thirdly, the proposed regulations, together with the Board's explanatory statement, demonstrate the Board's conviction that the burdens imposed by EPCA are not so severe as their NEPA counterparts. In the Board's view, EPCA does not demand extensive new procedures designed to produce detailed energy statements in advance of ordinary Board hearings:
 
 
 50
 In the absence of any specific requirements of EPCA to the contrary, and we perceive none, we believe it preferable as a general matter to integrate the Board's EPCA procedures in hearing cases within our normal hearing process rather than the unique NEPA procedures. Thus, we will provide that the initial or recommended decision integrate findings and conclusions with respect to the energy conservation and efficiency consequences of the various alternative actions in issue in the case, including where appropriate a brief analysis of such consequences in light of the other public convenience and necessity factors relevant to the decision. These findings and conclusions shall constitute the energy "statement" required by EPCA. This is the procedure we have in essence followed on an ad hoc basis since enactment of EPCA (citing, inter alia, the Miami-Los Angeles Competitive Nonstop Case ). . . . As is the case with all other aspects of an initial or recommended decision, the adequacy of the energy statement is subject to Board review under our usual discretionary review procedures.
 
 
 51
 Id. at 56670.
 
 
 52
 Finally, the Board has taken advantage of the opportunity provided by publication of its proposed regulations to inform interested parties that practicality may require limitation of the scope of the Board's energy impact statements. For example, while the Board foresees little problem in evaluating the effects of particular actions on aviation fuel consumption, it expresses concern that so-called secondary effects, such as variations in automobile fuel consumption, may prove impossible to determine. See id. at 56670 n.2. The commentary does not reveal whether feasible EPCA inquiries, as conceived by the Board, would entail consideration of increasing American reliance on foreign fuel, or potential peculiarities of local and regional fuel demands, two factors the importance of which is stressed by National.
 
 
 53
 While the proposed regulations have not yet received final approval, we have canvassed them in some detail because they inevitably color our perception of the arguments made herein pertaining to EPCA. National has maintained since January 7, 1976, less than one month after passage of EPCA, that the Board is obligated to issue a formal energy impact statement in connection with the Miami-Los Angeles route proceeding. One of the Board's responses in its March, 1976 order was that the award of competitive authority in the Miami-Los Angeles market did not constitute a "major regulatory action" within the meaning of § 382(b) of EPCA. At the time, some credence might have attached to this stance, especially in light of the earlier unchallenged conclusion that Docket 24694 did not involve "major Federal action significantly affecting quality of the human environment" under NEPA. However, after examining the Board's newly-proposed EPCA regulations, we believe that the Board cannot, in good faith, continue to assert that its decision in this case was not a "major regulatory action."[13] Given the predicted levels of fuel consumption for Western's Miami-Los Angeles operation, the present route proceeding would clearly qualify as a major action under the new rules, if adopted.
 
 
 54
 Assuming, then, that major regulatory action is involved herein, the question becomes whether the Board has complied with the terms of EPCA's § 382(b). We believe that it has. We agree, at the outset, that the energy impact statement required under EPCA need not be as elaborate or as formal as the environmental statement demanded by § 102(2)(C) of NEPA. The Board's opinion in this case leaves no doubt that energy factors did receive timely consideration (see J.A. 159-64), and that the public benefit to be derived from competition in the Miami-Los Angeles market was found to justify the additional fuel consumption which competitive service would entail.[14] Moreover, as disclosed by the Bureau of Operating Rights study, Western's predicted fuel needs were virtually identical to those of Northwest, and less than those of any other applicant for Miami-Los Angeles authority. J.A. 561. Thus, the Board appears to have chosen a carrier which will provide competition on the Miami-Los Angeles route at a minimal expenditure of fuel.
 
 
 55
 While we do not suggest that the "practicable and consistent" terminology of § 382(b) confers upon the Board carte blanche to ignore energy considerations whenever it finds it convenient to do so, we do express sympathy for the Board's position that this already much-delayed proceeding should not have been further postponed to permit preparation of a detailed energy statement which would have been highly unlikely to affect the outcome. Indeed, although future experience may not conform entirely to the Board's expectations, load factors forecast for the Miami-Los Angeles route after the initiation of competitive nonstop service compare favorably with those actually achieved by National during 1972. J.A. 163. At least according to this yardstick, therefore, the Board's award of Miami-Los Angeles authority to Western should yield not a decline, but an improvement, in overall energy efficiency. Of course, National contends that the Board's figures reflect an inflated estimate of the stimulative effect which the introduction of competition may be expected to produce in the Miami-Los Angeles market. But, even if discounted to allow for possible overoptimism, the Board's projections are impressive in light of the Board's own observation that "generally . . . one consequence of the certification of a competitor in a monopoly market is to depress load factors in the short term . . . ." 41 Fed.Reg. at 56672.
 
 
 56
 Finally, and perhaps most importantly, we agree with the Board that, as applied to individual route proceedings, § 382(b) is primarily intended to ensure that carrier selection is not accomplished in such a manner as to disregard energy conservation considerations. We do not read § 382(b) to impose on the Board an obligation to review all aspects of the airline industry's fuel policies in each route proceeding. As the Board stated in its March, 1976 order,
 
 
 57
 fuel consumption should be properly considered on an industrywide basis. . . . (N)ational fuel conservation efforts as they pertain to air transportation should, to the extent feasible, be borne equally by all segments of the air transportation system. Fuel conservation efforts should not deprive particular communities of needed service simply because that service has not been operated before.
 
 
 58
 J.A. 162. Finding ourselves in basic accord with the sentiments thus expressed, we conclude that the Board has committed no violation of EPCA in this case.
 
 IV
 
 59
 There remain those complaints emanating from the Board's action in shaping its decision by reference to a forecast year different from that used by the ALJ. Both Pan American and National assert that the Board erred in shifting from calendar year 1974 to fiscal year 1977 without affording petitioners an opportunity to participate in supplementing the record to reflect intervening economic developments.
 
 
 60
 We recognize the difficult and recurring problems faced by administrative agencies trying to cope with the inevitable time lag between the creation of an evidentiary record and the announcement of final agency action. We also acknowledge that, as the Board here contends, necessary updating may on occasion be accomplished by an agency acting independently and informally, without resort to adversarial procedures. However, in the present case, we are persuaded by a combination of factors that fundamental fairness required the Board to give Pan American a chance to submit its own version of changes in circumstances occurring between 1973 and 1976 and to comment upon the relevance of those changes to the award of Miami-Los Angeles route authority.
 
 
 61
 The factors which, when considered together, impel us to this conclusion are as follows:
 
 
 62
 (1) the delay involved was substantial, and covered a period peculiarly characterized by new circumstances affecting air transportation;
 
 
 63
 (2) the record adjustments made by the Board operated significantly to the detriment of a particular carrier;
 
 
 64
 (3) that carrier has presented plausible arguments refuting the Board's interpretation of certain facts and challenging the Board's alleged failure to take account of other newly available information; and
 
 
 65
 (4) by attaching such great weight to diminished estimates of Pan American's beyond segment traffic potential, the Board has at least arguably departed from its earlier position concerning the importance of beyond segment service as a carrier selection criterion in transcontinental route cases.
 
 
 66
 Given all the elements of the situation, we believe the Board was obligated to seek the benefit of Pan American's views regarding the impact of the passage of time upon the record evaluated by the ALJ.[15]
 
 
 67
 In several cases, the vast majority of them involving the Interstate Commerce Commission, the Supreme Court has addressed itself to the closely related subjects of agency rehearings and reopenings of administrative records. The basic rule, repeatedly endorsed, is that reconsideration or supplementation, in whatever form, is a matter entrusted to agency discretion. The classic statement of this general principle, recently reiterated with approval in both Bowman Transp., Inc. v. Arkansa-Best Freight System, Inc., 419 U.S. 281, 294-95, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), and United States v. ICC (Northern Lines Merger Cases), 396 U.S. 491, 520-21, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970), may be found in ICC v. Jersey City, 322 U.S. 503, 514-15, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944). There, Justice Jackson wrote, in an opinion for the Court:
 
 
 68
 One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up to date and meanwhile to stall the enforcement of the administrative order. Administrative consideration of evidence particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body.
 
 
 69
 Justice Jackson observed that only once had the Court reversed an agency "for refusing to grant a rehearing on the contention that the record was 'stale.' " Id. at 515, 64 S.Ct. at 1135. That case, Atchison, T. & S. F. Ry. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), was soon limited to its special facts, and has had little precedential influence. See, e. g., United States v. Northern Pac. Ry., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914 (1933); Baltimore & O. R.R. v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 80 L.Ed. 1209 (1936) (Brandeis, J., concurring); and 1 K. Davis, Administrative Law Treatise § 8.18 at 603 (1958).
 
 
 70
 We note in passing that the facts in the current litigation are far more similar to those presented in Atchison than to those confronted by the Court in either Jersey City or Northern Lines.[16] We also note that on scattered occasions, the Board itself has agreed to reopening of the record for reasons hardly more compelling than those raised by petitioners here. See, e. g., Service to Omaha and Des Moines Case, Order 72-8-72 (August 16, 1972); Atlanta-Detroit/Cleveland/Cincinnati Investigation, Order 72-7-98 (July 28, 1972); and Additional Service to San Diego Case, Order 71-4-112 (April 16, 1971).[17] On the other hand, in Bowman a unanimous Court concluded that there was "sound basis for adhering to (the) practice of declining to require reopening of the record, except in the most extraordinary circumstances," despite the fact that "the evidentiary material (in the record) pertained to service conditions which were dated by five years at the time the Commission rendered its decision."[18] 419 U.S. at 294, 296, 95 S.Ct. at 446.
 
 
 71
 The most important point for our purposes, however, is that petitioners here do not seek reopening merely on the ground of delay. As Pan American has emphasized, the complaint focuses not so much on staleness as on the selective character of the updating voluntarily undertaken by the Board. Pan American objects first of all to the Board's adjustment of the beyond-segment traffic figures generated by the ALJ. In his 1973 decision, the ALJ concluded that a primary reason for certification of Pan American on the Miami-Los Angeles route was the carrier's projected ability to serve over 132,000 beyond-segment passengers during calendar year 1974.[19] This figure was far greater than the beyond-segment benefits claimed by other applicants; it was even further in excess of the beyond-segment traffic which the ALJ believed other applicants had a legitimate possibility of carrying.[20] Nevertheless, in March, 1976, when the Board issued its first opinion in the Miami-Los Angeles proceeding, that opinion declared that "on a relative basis, the record shows that Western will be able to provide more significant beyond benefits than any other applicant."[21]
 
 
 72
 Addressing itself to the greatly superior beyond-segment potential attributed to Pan American by the ALJ, the Board announced that
 
 
 73
 we share the uniform judgment of all of the other applicants that Judge Dapper's estimates . . . seriously overstate the support traffic that Pan American is in any way likely to obtain. It is our conclusion that as a result of the cumulative effect of the overstatements that we have found extant in traffic forecasts for Pan American and the changes to its beyond-terminal services since the conclusion of the evidentiary proceedings, Pan American will not be able to realize, at the outside, more than 50 percent of the beyond-segment traffic support predicted by Judge Dapper, or about 65,000 passengers annually. Even this figure, in our judgment, is in all likelihood too optimistic by an appreciable margin, but we accept it for present purposes.
 
 
 74
 Three explanations were advanced for the Board's reduction of Pan American's predicted beyond-segment traffic. In the first place, actual experience in the wake of the ALJ's decision had revealed that the growth estimates employed were too high, and that therefore traffic in many contributory markets had not reached expected levels. Secondly, the Board cautioned that
 
 
 75
 the value of Pan American's proposed single-plane flights will be compromised to a far greater extent than anticipated in the initial decision by the extremely long-haul nature of the carrier's proposed service in many markets. . . . These considerations significantly reduce the stimulative value of Pan American's proposed service. At the same time, they increase the possibility that Pan American will lose Miami passengers to other carriers for at least a portion of the complete trip.
 
 
 76
 Finally, "substantial alterations in Pan American's route structure and service patterns" occurring since the close of economic hearings in 1973 were said to have "fatally undermine(d) Pan American's asserted ability to flow enough traffic over the Miami-Los Angeles segment to support its proposed level of service." In particular, the Board feared that Pan American's suspension of service at "many important Caribbean points" would render the carrier incapable of meeting its beyond-segment traffic goals.
 
 
 77
 In its petition for reconsideration before the Board and in its brief to this court, Pan American has responded to the Board's new calculations by accusing the Board of selectively ignoring certain factors, some of them favorable to Pan American, other adverse to Western. For example, Pan American contends that its termination of service to various Caribbean markets occurred as a result of Board-approved agreements with Trans World Airlines and American Airlines, pursuant to which Pan American obtained increased access to trans-Pacific traffic. According to Pan American, its augmented beyond-segment potential in the Pacific would largely, if not completely, offset any diminution of beyond-segment traffic originating in or destined for the Caribbean. Pan American also objected to the Board's uncritical acceptance of Western's beyond-segment traffic as projected by the ALJ in 1973. Since that date, Miami-Las Vegas and Miami-San Francisco service by other carriers had improved significantly, according to Official Airline Guide schedules, thereby casting doubt on the estimated numbers of beyond-segment passengers Western could hope to carry in those markets. In addition, Pan American challenged the Board's conviction that Western would benefit 7,000 beyond-segment passengers with single-plane service between Miami and Seattle. The unadjusted ALJ figure was seriously jeopardized, Pan American argued, by the Board's 1976 invitation to Braniff, Continental, and Eastern to apply for removal of restrictions which, if granted, would permit the latter airlines to offer single-plane Miami-Seattle service via shorter and faster routings through Texas and St. Louis.
 
 
 78
 The Board's alleged shortcomings with respect to beyond-segment traffic estimates were exacerbated in Pan American's view by the Board's failure to modify Pan American's proposed service frequency in order to approximate a rational carrier reaction to reduced levels of available traffic. Pan American notes that the Board, in attempting to demonstrate that National could continue to operate profitably after certification of a competitor on the Miami-Los Angeles route, assumed that National would provide only two daily round trips, despite the carrier's representation during the economic hearings that three such trips would be offered. The Board justified this assumption on the ground that twice daily round trip service would constitute a "rational response" by National to Western's entry into the Miami-Los Angeles market. Yet, in assessing the merits of Pan American's application, the Board first drastically cut the amount of traffic which the applicant could be expected to carry, and then left undisturbed the applicant's service proposal of three round trips daily. As a consequence, the Board concluded that
 
 
 79
 "(t)he nearly 300,000 additional seats per year proposed by Pan American are . . . not needed for the local market. . . . The loss of . . . forecast support (i.e., beyond-segment) traffic would fatally impair Pan American's ability to operate its proposed three daily round trips on a profitable basis, and consequently vitiates any basis for selecting Pan American in preference to Western."
 
 
 80
 In rebuttal, Pan American submitted a revised service proposal, designed to illustrate that, even with the reduced numbers of passengers predicted by the Board, the carrier could still operate two daily round trips profitably. See Appendix A to Pan American's Petition for Reconsideration, J.A. 510-11.
 
 
 81
 The above summary described Pan American's most serious criticisms of the Board's performance in the current route proceeding.[22] Although not specifically raised by the parties, one further facet of the Board's treatment of beyond-segment traffic deserves attention here. In 1969, when competitive authority on the Miami-Los Angeles route was originally awarded to Northeast, the Board casually dismissed beyond-segment service as an important carrier selection criterion in transcontinental markets:
 
 
 82
 (W)e do not believe that beyond-segment benefits should be accorded significant weight in the transcontinental route awards. By their very nature transcontinental markets afford little opportunity for substantial traffic development beyond the terminals.
 
 
 83
 Notwithstanding these earlier comments, the ALJ in 1973 obviously assigned considerable weight to what he perceived as Pan American's markedly superior beyond-segment potential. In reversing the ALJ three years later, the Board did not rely upon its previously announced disregard for beyond-segment benefits in transcontinental cases. Rather, the Board appeared to concede that beyond-segment traffic was a significant factor, but differed with the ALJ in his estimates of the amount of such traffic which Pan American would carry, and of the impact such traffic would have on Pan American's ability to serve the Miami-Los Angeles market.
 
 
 84
 Inconsistency in agency application of policy guidelines has long posed a problem for reviewing courts. On the one hand, it is clear that administrative agencies require a broad flexibility in order to accomplish their statutorily conferred tasks, and that therefore court-developed principles of res judicata and stare decisis cannot be mechanically applied in the administrative process. See, e. g., Outagamie County v. CAB, 355 F.2d 900, 906 (7th Cir. 1966) ("the Board is not required in every case to weigh in the balance all of the possible factors that may be considered . . . . (A) circumstance may weigh heavily in the balance in one case but be missing from the scales completely in another balance."). See also Note, Developments in the Law Res Judicata, 65 Harv.L.Rev. 818, 865-74 (1950).
 
 
 85
 On the other hand, the probability of frustration is plainly high when interested parties are told in 1969 that beyond-segment benefits are essentially irrelevant to transcontinental route awards, only to find in 1976 that the Board, when examining the very same route, behaves as if the prior statement had never been made. Respected commentators have frequently deplored agency decision-making which fails to adhere to promulgated policy choices, at least where such departures are not accompanied by explicit articulation of the reasons therefor. See, e. g., Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards (pt. 2), 75 Harv.L.Rev. 1055, 1096 n. 329 (1960) ("the Board ought (to) be able to say something as to how (carrier selection) factors are weighed which are more important and which less and to develop some useful quantitative tests of these . . . factors through careful economic study") (emphasis in original); Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 529 n. 173 (1970); and Westwood, The Davis Treatise: Meaning to the Practitioner, 43 Minn.L.Rev. 607, 613 (1959). And courts have upset agency action for unexplained departures from earlier reasoning. See, e. g., City of Lawrence v. CAB, 343 F.2d 583 (1st Cir. 1965). In this case, where the Board's seemingly inconsistent policy posture is combined with Pan American's credible attacks on the Board's selective updating technique, we are convinced that supplementation of the record is necessary to assure fairness to the competing applicants.
 
 
 86
 In advocating the result we reach, Pan American has referred us to two cases which it claims support such an outcome. See Delta Air Lines, Inc. v. CAB, 143 U.S.App.D.C. 8, 442 F.2d 730 (1970); and Northeast Airlines, Inc. v. CAB, 345 F.2d 484 (1st Cir.), cert. denied, 382 U.S. 845, 86 S.Ct. 41, 15 L.Ed.2d 85 (1965). Intervenor Western has replied by maintaining that both Delta and Northeast are distinguishable on their facts from the present situation. Indeed, the former case certainly does present a more egregious example of the type of abuse which we confront here.[23] But even if the errors committed in past cases are conceded to be more flagrant than any involved here, the opinions of this court and the First Circuit still support the general proposition which we now apply, namely, that when an agency chooses to update an administrative record, it must proceed in a manner fair to all concerned. Under certain circumstances, especially where the delay is long, the case close, and the intervening events significant, participation by interested parties may well be indispensable. Thus, we remand this record for adversarial exploration of the recent developments considered by the Board in reaching its decision to prefer Western over Pan American. We direct the Board to reexamine that decision in light of the updated record so produced. In the interim, the Board's 1976 orders will not be vacated, and service by Western on the Miami-Los Angeles route will not be suspended.
 
 
 
 *
 In order to distinguish this case from others of the same name, readers are encouraged to cite it as: Delta Air Lines v. CAB (Miami-Los Angeles route)
 
 
 [1]
 The Board is fully aware that Northwest may withdraw from the merger unless it receives the Miami-Los Angeles route outright. Nonetheless, the Board has reluctantly concluded that the public interest and the integrity of the Board processes can be vindicated only if the Board retains the power to reconsider that route award in later section 401(g) proceedings. Otherwise, we would find that the merger would be inconsistent with the public interest. Thus, the Board finds itself compelled to stay the authorization for Northwest to operate the Miami-Los Angeles route pending completion of the subsequent proceedings
 Acceptance of the examiner's view can only encourage the formulation of merger plans, intentionally or otherwise, based upon the outcome of pending route proceedings. In order to avoid that result, the Board believes that it must reexamine the pre-merger route award in the light of the circumstances as they exist following the merger.
 The Board hopes that Northwest will reconsider its threat to withdraw from the merger if the Miami-Los Angeles route is stayed. The Board has not rejected Northwest's claim to the route; it has simply concluded that the question must be decided in a new evidentiary proceeding. If Northwest consummates the merger, it will have full opportunity in the section 401(g) proceeding to justify its retention of the route. In this connection, Northwest will be free to argue that (as the examiner concluded) the Northeast system should be regarded as an integrated whole, with the profitable routes needed to offset the marginal ones. And Northwest can repeat its assertions that the Miami-Los Angeles route integrates well with its present authority beyond California to Hawaii and the Orient.
 
 
 [2]
 Section 401(g) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1371(g) (1970), provides, in pertinent part:
 The Board upon petition or complaint or upon its own initiative, after notice and hearings, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require, or may revoke any such certificate in whole or in part, for intentional failure to comply with any provision of this subchapter or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate . . . .
 
 
 [3]
 For a detailed treatment of the NEPA aspect of the Miami-Los Angeles route proceeding, see Burger, Miami-Los Angeles and NEPA: The Use of the National Environmental Policy Act of 1969 as an Anticompetitive Weapon, 42 J. Air L. & Com. 529 (1976). The author observes that economic regulatory agencies such as the CAB generally lack the technical expertise necessary for the analysis of environmental issues, and that the difficulties are compounded when such analysis must take place in the context of a licensing proceeding. In the aftermath of the lengthy delay occasioned by NEPA considerations in the Miami-Los Angeles case, the CAB has adopted a set of regulations, instituting a regularized NEPA compliance system. See id. at 567-73; 40 Fed.Reg. 37,184-203 (1975); and 14 C.F.R. Part 312 (1976)
 
 
 [4]
 Apparently, CAB grants of additional operating authority are ordinarily implemented through the tacking of a new segment, embodying the newly-awarded route, onto an existing route certificate held by the carrier and involving at least one of the terminal points of the new route. See CAB Brief at 76 n.37 and 80 n.39. While the reason for this practice has not been explained to us, we cannot discern any indication in the record that the Board has deliberately employed this device to facilitate subsequent route structure manipulation, and to permit evasion of statutory procedural requirements
 
 
 [5]
 At the same time, Delta purported to have detected in the Board's original opinion an implication that "if Northwest did go ahead with the merger on the basis stipulated, Northwest might have some advantage over the other applicants in the 401(g) proceeding . . . ." We find no such implication in our reading of the relevant portion of the Board's opinion
 
 
 [6]
 Subsections 401(a) and (b) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. §§ 1371(a), (b) (1970), provide:
 (a) No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation.
 (b) Application for a certificate shall be made in writing to the Board and shall be so verified, shall be in such form and contain such information, and shall be accompanied by such proof of service upon such interested persons, as the Board shall by regulation require.
 
 
 [7]
 In the absence of such an entitlement, Delta does not quarrel with the Board's finding that the selection of Western for the Miami-Los Angeles route will produce greater public benefits than the selection of Delta
 
 
 [8]
 On the other hand, we also express no opinion as to the correctness of the Board's interpretation of the term "certificate" as used in § 401(g). The Board insists that, properly read,
 the "certificate" to which Congress had reference in Section 401(g) is the carrier's overall operating authority rather than each of the particular routes awarded the carrier. . . . Any other interpretation of the Act would be entirely illogical, as some carriers' route authorizations are contained in one certificate while other carriers have a number of certificates covering one or more routes. Whether a carrier's route authorizations are contained in one or more documents turns upon such matters as historical accident, distinctions between authorizations which require Presidential approval and those which do not, and administrative convenience . . . .
 While appealing in some respects, the Board's construction is surely not obligatory, and, in fact, directly contradicts the District Court's holding in Pan American World Airways v. Boyd, 207 F.Supp. 152, 158 (D.D.C.1962), rev'd on other grounds sub nom. Alaska Airlines v. Pan American World Airways, 116 U.S.App.D.C. 128, 321 F.2d 394 (1963). The Board asserts that the latter case is not "persuasive precedent," apparently for no reason other than that it did not conform to the prior position of the Board. Finding resolution of the issue unnecessary to our decision herein, we leave to another day the precise definition of "certificate" as used in § 401(g).
 
 
 [9]
 Delta's citation of the Supreme Court's stress on "route security" as an element of Congressional concern underlying § 401(g) is inapposite. No merger was involved in CAB v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), and, accordingly, no question of the Board's broad powers under § 408(b) arose in that case
 Likewise, Delta's reliance on Western Air Lines v. CAB, 161 U.S.App.D.C. 319, 495 F.2d 145 (1974), is misplaced. Because the court in Western was dealing with a non-merger situation, its comments related solely to § 401(g) viewed independently of § 408(b). However, even accepting the court's language in Western at face value, we find no merit in Delta's position. In § 401(g), the court said, "(t)he Board was given the power to respond to changed economic conditions and redefinitions of 'the public convenience and necessity' by adjusting the operating authority of carriers." 161 U.S.App.D.C. at 330, 495 F.2d at 156. Surely an important transaction like the merger of Delta and Northeast may present an appropriate occasion for a redefinition of "the public convenience and necessity" to which the Board may respond under § 401(g).
 
 
 [10]
 The Board's dependence upon § 401(g) appears to be traceable to a footnote in the United-Capital Merger Case, 33 C.A.B. 307 (1961), aff'd sub nom. Northwest Airlines v. CAB, 112 U.S.App.D.C. 384, 303 F.2d 395 (1962). The facts in that proceeding were significantly different from those now before us. Capital Airlines, Inc. was in dire financial straits. The Board found, and this court agreed, that Capital would not have survived if the merger with United had been disapproved. Two carriers, Delta and Eastern,
 requested that the Board condition approval of the merger on United's acceptance of the nontransfer of certain portions of Capital's route authority. . . . At the oral argument before the Board, Eastern proposed an alternative procedure; i. e., that the Board approve the merger conditioned upon (1) the simultaneous institution of an investigation under section 401(g) of the Act to determine whether the alteration, amendment, modification, or suspension in whole or in part, of any or all of the certificates of public convenience and necessity of Capital is required by the public convenience and necessity; and (2) the maintenance of the status quo with respect to Capital's nonstop operations during the investigation.
 The Board, concerned that any attempt to impose major route authority restrictions might jeopardize the impending merger, rejected both suggestions, and this court upheld that decision, on both practical and legal grounds. See especially 112 U.S.App.D.C. at 386-87, 389-90, 303 F.2d at 397-98, 400-01.
 In the course of its opinion, the Board ventured the following aside, describing the mechanism by which Eastern's proposal could have been implemented, if its substance had been accepted by the Board:
 As a procedural matter, any withholding of Capital's route authority from United would have to be accomplished through staying the appropriate portions of the Capital certificates transferred to United and instituting a sec. 401(g) proceeding to alter, amend, modify, or suspend the portions of the certificates in question. While we could, within the scope of this proceeding, place limitations upon United's use of the authority received by transfer to United, action upon the certificates themselves, to alter, or terminate, the routes involved would require a public convenience and necessity inquiry under sec. 401(g) of the Act.
 
 
 [33]
 C.A.B. at 318 n.52. The Board cited no authority for the proposition that certificates could not be amended, even in the merger context, without resort to a § 401(g) proceeding. The Board's power to impose merger conditions under § 408(b) was not discussed at this juncture
 However, the Board did find that unrestricted approval of the merger would result in excessive diversion from two carriers already partially supported by government subsidy, Allegheny and Mohawk. Therefore, the Board determined to make certain comparatively minor route adjustments in the authority transferred from Capital to United. Despite its earlier indication that § 401(g) proceedings would have been required in connection with the restrictions proposed by Eastern and Delta, the Board accomplished the modifications it deemed desirable in a rather informal fashion with no mention of § 401(g).
 
 
 [11]
 Before taking final action on the proposed regulations, the Board will consider all comments received by February 14, 1977
 
 
 [12]
 The ten million gallon figure represents approximately one-tenth of one percent of
 certificated route carriers' total consumption of aviation gasoline and jet fuel in calendar year 1972, which is the last full year not reflecting the effects of the Arab oil embargo and OPEC price escalation, and the resultant petroleum conservation measures.
 
 
 [41]
 Fed.Reg. at 56671 (footnote omitted)
 
 
 [13]
 In its brief to this court, submitted several months before publication of the proposed regulations, National flirted with the argument that the Board, since it had not yet established a formal definition of "major regulatory action," could not legitimately exclude the Miami-Los Angeles case from the "major action" category. We do not believe that as a consequence of EPCA's enactment, five federal agencies became obligated either to treat future administrative matters as "major regulatory actions" or else to suspend further proceedings pending the outcome of rulemaking on the appropriate definition of the statutory phrase. Of course, the agencies were duty-bound to proceed in a responsible and speedy fashion toward the adoption of the statutorily prescribed regulations. However, they were not thereby precluded from making reasonable interim determinations that particular agency decisions did not rise to the level of "major regulatory actions."
 
 
 [14]
 National's admirable concern for fuel economy is compromised somewhat by the carrier's representation to the ALJ in Docket 24694 that, if National retained its monopoly status on the Miami-Los Angeles route, it planned to commence operation of a third daily round trip by 1974, the forecast year employed by the ALJ. J.A. 133-34. National never did, in fact, initiate such service, even though it continued to enjoy monopoly authority through the summer of 1976. Nevertheless, the mere promise of a third flight reveals National's judgment that additional fuel consumption might be necessary to adequately serve the Miami-Los Angeles market
 
 
 [15]
 As noted above, National also challenged the Board's independent updating of the record. We do not believe, however, that National was injured in any way by the Board's refusal to permit participation by the parties. In its 1976 orders, the Board reaffirmed the ALJ's conclusion that the public convenience and necessity required competition on the Miami-Los Angeles route. National has not drawn our attention to any factors which indicate that procedural shortcomings caused the Board to ignore evidence suggesting a contrary outcome on the need for competition issue
 
 
 [16]
 In Atchison, the ICC had entered an order prescribing maximum rates for the shipment of grain in the western part of the United States. The evidentiary record had been closed in September, 1928, but the Commission's final order was only issued in April, 1931, after two applications for rehearing had been denied. The Supreme Court held unanimously that the existing record in the case pertained to a different economic era, and that it was incumbent upon the Commission to conduct a new hearing to determine the effects of the Great Depression, "the outstanding contemporary fact, dominating thought and action throughout the country." 284 U.S. at 260, 52 S.Ct. at 149
 By contrast, in Jersey City, the ICC's order granting a fare increase on the so-called Hudson Tubes was issued less than nine months after the conclusion of extensive evidentiary hearings. Two months later, in August, 1943, a limited rehearing was held, confined to the issue of the most practicable means of collecting a nine-cent fare, given the wartime coin scarcity. The Supreme Court decided, not surprisingly, that opponents of the fare increase had no right to relitigate the propriety of the increase in the 1943 rehearing.
 Northern Lines was a railroad merger case in which terms were negotiated between the parties by 1961, approved by an ICC Hearing Examiner in 1964, and finally accepted by the Commission in 1967. Throughout the proceedings, the Northern Pacific Stockholders' Protective Committee objected to the agreed-upon exchange ratio governing transfers of stock between shareholders of the two principal parties to the merger, Great Northern and Northern Pacific. In reviewing the Commission's endorsement of the merger, the Supreme Court rejected the Committee's contention that the ICC should have reopened the record in 1967 for the taking of new evidence on the exchange ratio. The Court was obviously impressed by the fact that the exchange ratio was the product of hard bargaining between the parties, and had twice been approved by overwhelming majorities of Northern Pacific shareholders.
 Although the changed economic conditions present in Atchison were clearly more acute than those involved here, the earliest of the three cases described above still seems to resemble the current situation more closely than do either Jersey City or Northern Lines. One further point remains to be made. Both Atchison and Jersey City were rate-making cases, and Northern Lines involved a merger, presumably desirable to the primary participants therein. Here, by contrast, we are concerned with competing applicants for authority to operate air service over a given route. Arguably, at least, the impetus toward reopening an administrative record is greater where an agency's task is to choose between similarly-situated private parties, all of whom are doubtless capable of providing the service at issue.
 
 
 [17]
 In Omaha and Des Moines, the Board had deferred action on petitions for reconsideration filed shortly after issuance of a 1970 order. When, almost two years later, the Board finally began to review the petitions, it decided to reopen the record saying
 (t)he existing record with 1967 as the base year and 1970 as the forecast year is clearly too stale to permit a decision on the merits without further evidentiary proceedings. In addition, the normal growth rates adopted by the examiner on the basis of 1964-1967 historical experience appear to be too optimistic in light of more recent traffic trends. New record evidence is therefore desirable.
 In Atlanta-Detroit, reopening was ordered to consider possible effects of the Allegheny-Mohawk and Delta-Northeast mergers on various carrier selection criteria. Conceding that the record, with 1968 as the base year and 1971 as the forecast year, was "somewhat stale" by July, 1972, the Board also expressed a desire to take account of "recent traffic trends" which indicated that the growth ratio adopted by the examiner had been too high.
 In San Diego, the Board erroneously used fiscal 1971 rather than calendar 1971 traffic estimates in attempting to determine whether Western could continue to operate profitably if competition were certificated on the San Diego-Denver route. The revised figures made an already close question even closer, and the Board decided to reopen the record to get the benefit of the most recent traffic and cost data.
 
 
 [18]
 Why the Bowman Court felt constrained to discuss the reopening issue is something of a mystery. Justice Douglas's opinion purports to respond to concerns expressed by the three-judge District Court, but the cited portion of the District Court's lengthy opinion contains virtually no reference to the undesirable consequences of administrative delay. The private appellants in the Supreme Court suggested that the District Court had invalidated the ICC order under review at least partially because that order was based on a stale record. See Brief for Private Appellants at 54. This position finds no support in the District Court's opinion. Indeed, the lower court's only direct reference to the age of the record appeared not in its opinion on the merits but in its opinion three weeks later, denying the Commission's motion to amend the judgment and remand for further proceedings. See Arkansas-Best Freight System Inc. v. United States, 364 F.Supp. 1239, 1266-72 (W.D.Ark.1973). See also Appellees' Brief to the Supreme Court at 61. Given this background, the precedential value of the reopening aspect of Bowman seems highly dubious
 
 
 [19]
 A beyond-segment passenger is one who must utilize Miami-Los Angeles service in connection with a longer trip whose point of origin or destination or both is neither Miami nor Los Angeles
 
 
 [20]
 Western offered the second largest beyond-segment potential, i. e., nearly 57,000 beyond-segment passengers in 1974. The ALJ reduced this estimate to a figure just below 44,000
 
 
 [21]
 In a footnote, the Board delivered its appraisal of the statistics upon which its comments were based:
 The traffic estimates are those set out by the administrative law judge, which are not seriously challenged by the other applicants. However, Western's exhibits show far more beyond traffic, and the Board agrees that in view of market growth since the conclusion of the evidentiary hearing and the use of a later forecast year, it is likely that the estimates reflected in the initial decision understate Western's total support traffic. Nevertheless, for present purposes we shall assume that the administrative law judge's estimates are reasonable, since the use of Western's higher figures would not materially affect our conclusions in this case.
 
 
 [22]
 Two other grievances should be mentioned briefly. The first relates to the Board's fear that Pan American's lengthy flights to overseas destinations would detract from the carrier's ability to serve the local Miami-Los Angeles market. By contrast, the Board praised Western's service proposal because one of the two daily round trips would be devoted exclusively to the Miami-Los Angeles run and the other would serve only a single beyond destination, Seattle. In actual operation, however, Western's flights have originated each day in Honolulu and Anchorage, and the latter flight has served Seattle as well. Not surprisingly, Pan American questions whether the Board could legitimately have preferred Western on the basis of superior attention to the Miami-Los Angeles route
 Secondly, Pan American notes that, with respect to at least one flight daily, Western has not fulfilled its promise of "convenient morning and late afternoon departures from both Miami and Los Angeles and convenient arrivals at both points." Western has in fact been operating a so-called "red-eye" flight departing Los Angeles each evening at 10:20 P.M. and arriving in Miami the following morning at 6:15 A.M.
 Western and the Board explain that the scheduling discrepancies stressed by Pan American are attributable to Western's current need for a new DC-10 aircraft which has already been ordered. The Board expresses confidence that Western "will shortly be able to institute schedules that are consistent with its service proposal." Given our disposition of this case, we would, of course, anticipate that the likelihood of Western's adherence to its original proposal will be considered by the Board after supplementation of the record.
 
 
 [23]
 In Delta the Board addressed itself to the award of new authority on several routes connecting major markets in the southeastern United States. In granting such authority to Southern Airways, the Board twice strayed from the correct procedural path. In the first place, the Board, while retaining and continuing to use 1969 estimates of Southern's annual costs, simultaneously factored into its profitability calculations a 1970 forecast of the airline's operating revenues. This forecast was independently developed by the Board after the close of economic hearings. More pertinent for our purposes, Southern was the only applicant for which such a 1970 forecast was made. This court held that "updating can only be justified if done on a comparative basis, i. e., updating the forecasts for all parties." 143 U.S.App.D.C. at 14, 442 F.2d at 736. Judge Wilkey's opinion listed several procedural alternatives which might allow updating to be accomplished without the necessity for a new formal hearing. Id. In a footnote, the opinion warned, but did not decide, that some form of adversarial device might be required
 Even if the parties had had opportunity to update their own forecast data to the year 1970, we are not saying that required administrative procedure would have been satisfied without an opportunity for the adverse parties to subject the various calculations to cross-examination and analysis.
 Id., 143 U.S.App.D.C. at 14, 442 F.2d at 736 n.25.
 The precise facts in Northeast are a bit murky, but the basic point is clearly the same. On remand after an earlier First Circuit ruling, the Board elected to take notice of some recent operating statistics without affording Northeast an opportunity to rebut or explain the figures. The carrier apparently wished to submit additional figures as well as certain "expert testimony of an interpretive and prognostic variety." The court agreed that Northeast should have that chance.
 (A)s soon as (the Board) elected to look at matters (beyond the record as it originally existed,) it could not pick and choose, at least to the extent of denying an objecting party the rights . . . to rebut not only those matters it looked to, but also the inferences which were sought to be drawn therefrom. Due process could permit no less. . . .
 Having opened the door to new data, the Board was obliged to take a full look.
 345 F.2d at 486-87. It is impossible to tell from the court's intentionally limited opinion exactly how grievous the Board's indiscretion was.