856 F.2d 209
 272 U.S.App.D.C. 255
 CONTINENTAL AIRLINES, INC., Petitioner,
v.
U.S. DEPARTMENT OF TRANSPORTATION, Respondent,
United Air Lines, Inc., United Pilots Master Executive
Council, American Airlines, Inc., Port of Seattle,
Intervenors.
 No. 87-1497.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 16, 1988.
Decided Aug. 26, 1988.
 
 Ronald A. Stern, with whom Thomas D. Goldberg, Andrew T. Karron, Washington, D.C. and Clark H. Onstad were on the brief, for petitioner.
 Kenneth N. Weinstein, Deputy Asst. Gen. Counsel, Dept. of Transp., with whom B. Wayne Vance, Gen. Counsel, Dept. of Transp., John R. Bolton, Asst. Atty. Gen., James M. Spears, Acting Asst. Atty. Gen. at the time the initial brief was filed, and John F. Cordes, Jr., Atty., Dept. of Justice, Washington, D.C. were on the brief, for respondent.
 
 
 1
 J. William Doolittle, with whom Alfred V.J. Prather and Carl B. Nelson, Jr., Washington, D.C. (for American Airlines, Inc.), John W. Angus III, Washington, D.C. (for The Port of Seattle), Robert H. Nichols (for United Pilots Master Executive Council), William H. Allen and Charles A. Miller, Washington, D.C. (for United Airlines, Inc.) were on the joint briefs, for intervenors.
 
 
 2
 Before MIKVA and BUCKLEY, Circuit Judges, and GARTH,* U.S. Senior Circuit Judge for the Third Circuit.
 
 
 3
 Opinion for the court filed by Circuit Judge BUCKLEY.
 
 
 4
 Dissenting opinion filed by Senior Circuit Judge GARTH.
 
 BUCKLEY, Circuit Judge:
 
 5
 Continental Airlines petitions for review of a final order of the Department of Transportation dismissing Continental's application for route authority. In an earlier proceeding, the Department had approved United Airlines' acquisition of certain routes from Pan American World Airways. This approval was conditioned on United's agreement to relinquish its Seattle/Portland to Japan route if the Department, in a subsequent proceeding, determined that another carrier would better serve the public interest. In that subsequent proceeding, Continental and American Airlines applied for United's route. The Department and the parties thought these applications had to be processed within rigid statutory deadlines.
 
 
 6
 As the case was proceeding through the Department, however, a key decisionmaker (who had been directed to revise his assessment of an Administrative Law Judge's recommendation that the route be awarded to Continental) found it necessary to disqualify himself. The Department concluded that it could not complete its review within the statutory time limit. Although the Department then professed to believe that the deadline did not apply, it nevertheless dismissed the applications and ordered the case restarted. Continental argues that when the Department became unable to complete its review, the statute required it to forward the Administrative Law Judge's decision as its own. We agree and grant the petition for review.
 
 I. BACKGROUND
 A. Legal Background
 
 7
 Three statutory provisions bear on the case. First, section 408 of the Federal Aviation Act ("Act") permits the Department of Transportation ("DOT") to review mergers or purchases involving airlines. This authority, first granted to the Civil Aeronautics Board ("CAB") and later transferred to the DOT, 49 U.S.C.App. Sec. 1551(b)(1)(C) (1982), includes the power to impose conditions upon an airline's transfer of authority to serve certain routes. See 49 U.S.C.App. Sec. 1378 (1982).
 
 
 8
 Second, under section 401(g) of the Act, the DOT may "alter, amend, modify, or suspend any such certificate [authorizing air service], in whole or in part, if the public convenience and necessity so require." 49 U.S.C.App. Sec. 1371(g)(1) (1982). Apart from its power to withdraw part of an airline's authority, the DOT also may revoke a certificate altogether "for intentional failure to comply" with any applicable statutory or regulatory provision or any "term, condition, or limitation of such certificate." Id. The DOT may order a hearing on its proposal to alter or revoke a certificate, and it must hold a hearing if the certificate holder requests one. Id.
 
 
 9
 Third, under section 401(c) of the Act, an application for a certificate authorizing air service must be processed according to rigid statutory deadlines. Once the application is filed, the DOT must choose between three options within ninety days: full hearing, simplified procedures, or dismissal "on the merits." 49 U.S.C.App. Sec. 1371(c)(1) (1982). If the application is set for hearing (as in this case), the "initial or recommended decision [of the ALJ] shall be issued not later than one hundred and fifty days" after the application is set for hearing. 49 U.S.C.App. Sec. 1371(c)(2) (1982). Within ninety days after the ALJ's decision, the DOT "shall make its final order with respect to such application." Id. If it fails to do so, "the initial or recommended decision shall be transmitted to the President...." 49 U.S.C.App. Sec. 1371(c)(2)(B) (1982).
 
 B. Factual Background
 
 10
 In the Pacific Division Transfer Case ("PDT"), 2 Av.L.Rep. (CCH) p 22,382 (Oct. 31, 1985), the Secretary of Transportation approved with conditions the application of United Airlines, Inc. ("United") to acquire the Pacific routes of Pan American World Airways, Inc. ("Pan Am"). The Secretary was concerned, however, because the purchase would reduce the number of U.S. carriers serving Japan from three to two. Although she considered requiring United to spin off its Seattle/Portland to Japan route, Secretary Dole concluded that there was insufficient information concerning the ability of other carriers to provide adequate service to reach a final decision on this alternative. The Secretary decided that "it would be preferable to compare various carriers' abilities to provide service, and weigh the quality of service each, including United, would provide against the desirability of maintaining the current market structure." Id., p 22,382, at 14,495. She concluded that a "comparative selection case is the best means of developing a sound record on which to decide these issues." Id. Secretary Dole therefore approved the acquisition subject to the following condition:
 
 
 11
 My approval is subject to the condition that, should the Department determine in a future proceeding that the public interest would be served by authorizing another U.S. flag carrier to provide service ..., United will surrender its authority to provide such service within 60 days of an order directing it to do so....
 
 
 12
 Id. at 14,502. Pending the completion of the comparative selection proceeding, United was permitted to continue service from Seattle to Japan.
 
 
 13
 The DOT subsequently initiated the Seattle/Portland-Japan Service Review Case "to compare the carriers' abilities to provide service, and to weigh the quality of service offered by each carrier, including United...." Order Instituting Investigation ("Instituting Order"), Order No. 86-9-92 (Sept. 30, 1986), Joint Appendix ("J.A.") at 37. Continental Airlines, Inc. ("Continental") and American Airlines, Inc. ("American") applied for the Seattle-Japan route. Following a hearing, the Administrative Law Judge ("ALJ") recommended that Continental be chosen to replace United. Recommended Decision ("ALJ recommendation"), J.A. at 69. The ALJ treated the proceeding as a comparative route case and declined to give United an incumbent's preference, that is, the presumption in favor of renewal of existing route authority.
 
 
 14
 The parties filed exceptions, and the ALJ's decision was reviewed by the senior career officer ("SCO") in the Office of the Assistant Secretary for Policy and International Affairs (in this case, the Deputy Assistant Secretary), as required by 14 C.F.R. Sec. 302.22a(b) (1988). On August 10, 1987, the SCO reversed the ALJ and recommended that United be permitted to retain the route. Opinion and Order ("SCO Opinion"), 2 Av.L.Rep. (CCH) p 22,420, at 14,721. Pursuant to 14 C.F.R. Sec. 302.22a (1988), the SCO transmitted his opinion to the Assistant Secretary for Policy and International Affairs, who remanded the opinion to the SCO to correct various deficiencies in his recommended decision. Notice of Review and Order of Remand ("Notice of Review"), 2 Av.L.Rep. (CCH) p 22,420, at 14,718 (Aug. 21, 1987). The Assistant Secretary noted that the "statutory deadline in this proceeding is September 17, 1987" and ordered the SCO to complete his revisions by September 10, 1987 so that the DOT could meet the statutory deadline. Id. at 14,721.
 
 
 15
 The SCO then revealed that he had accepted employment with the Flying Tiger Line, Inc., an intervenor that had supported United. In an Order to Show Cause, Order No. 87-9-11 (Sept. 4, 1987), the DOT asked the parties to waive the "statutory deadline of September 17, 1987" so that it could appoint a new SCO. J.A. at 138. Despite the Department's plea, most of the parties declined. United, for example, thought the DOT was bound by the "clear dictate both of the controlling statutory provision (49 U.S.C.App. Sec. 1371(c)(2)) and the Department's own regulations (14 C.F.R. Sec. 302.1757(a))" to issue its final order not later than September 17, 1987. Opposition to Waiver of Statutory Deadline, J.A. at 140.
 
 
 16
 The DOT dismissed the applications for route authority and, in its Final Order, promised to institute a new comparative proceeding (i.e., new hearing before an ALJ) to decide the merits. 2 Av.L.Rep. (CCH) p 22,924 (Sept. 17, 1987). In the Department's view, it could not grant either Continental's or American's application before it had decided to delete United's authority under section 401(g) of the Act, 49 U.S.C.App. Sec. 1371(g) (1982). Under that section, United had a right to a hearing conducted according to the requirements of the Administrative Procedure Act ("APA"). The APA entitles an interested party to file exceptions to the ALJ's recommended decision and to receive the agency's ruling on each exception. See 5 U.S.C. Sec. 557(c) (1982).
 
 
 17
 As the Department could not adequately respond to United's exceptions before September 17, 1987, the DOT found that the requirements of section 401(g) and the APA conflicted with the statutory deadline of section 401(c), and concluded that the former provisions should prevail. The DOT nevertheless recognized that it had "assumed that a statutory deadline applies in this case," and decided to "issue a final order that satisfies our obligations under section 401(c)." Id. at 14,746. It thought that under the unique circumstances of this case, a final order of dismissal would satisfy those section 401(c) obligations.
 
 
 18
 Continental petitions for review, arguing that the DOT was required to transmit the ALJ's decision to the President.
 
 II. DISCUSSION
 
 19
 Under the familiar principles of Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), we first ask "whether Congress has directly spoken to the precise question at issue." If the statute is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781-82. We determine the plain meaning of the statute independently by examining, in the first instance, the "particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., --- U.S. ----, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). If congressional intent is unclear, we then inquire whether the agency's interpretation is "permissible," Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, i.e., "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987).
 
 A. The Deadlines of Section 401(c) Apply
 
 20
 Following the Secretary's call in PDT for a comparative route case, Continental and American applied for route authority under section 401(b), 49 U.S.C.App. Sec. 1371(b) (1982). The DOT consolidated these applications with its reexamination of United's route authority and set the case for hearing under section 401(c)(1)(A), 49 U.S.C.App. Sec. 1371(c)(1)(A) (1982). Presumptively, this triggered the deadlines of section 401(c)(2), which provides that when "any application" is set for hearing, the ALJ must issue a decision within 150 days, and the Department must issue its final order within ninety days thereafter.
 
 1. Applicability of section 401(g)
 
 21
 The Department nevertheless claims that these deadlines do not apply. It argues that the alteration of United's certificate under section 401(g) was a logical prerequisite to the processing of petitioner's application under section 401(c). Until the DOT completed its section 401(g) proceeding, to which no deadlines apply, the deadlines on the processing of section 401(c) applications have no significance.
 
 
 22
 Whatever the merits of this claim in the abstract, the Department did not proceed in this fashion in the present case. At least until the final order under review, it is clear that the DOT interpreted section 401(c) as requiring the whole proceeding to be completed within its deadlines. When the Assistant Secretary remanded to the SCO, he stated that the "statutory deadline in this proceeding is September 17, 1987" and ordered the SCO to complete his revisions by September 10, 1987. Notice of Review, 2 Av.L.Rep. (CCH) p 22,420, at 14,721. After the SCO was disqualified, the DOT asked the parties to waive the statutory deadline. Order to Show Cause, J.A. at 137. The Final Order did not merely reassign the case to another SCO, as it would have had the section 401(c) deadlines been inapplicable, but dismissed the entire proceeding to comply with the now-disclaimed deadline.
 
 
 23
 Although the DOT construed the deadlines of section 401(c) as applying to this case, it now attempts to salvage its decision by noting that section 401(g) had been referred to in the Instituting Order and the ALJ recommendation. See J.A. at 38, 93-94. Until the Final Order, however, no one thought that this was a section 401(g) case. The ALJ declined to give United an incumbent's preference, as would have been appropriate if a section 401(g) proceeding had been a precondition to the 401(c) determination. ALJ recommendation, J.A. at 70-71. The SCO agreed. 2 Av.L.Rep. (CCH) p 22,420, at 14,725. Even United recognized that the revocation of its authority was premised on the merger condition, not on section 401(g): "Section 401(g)(1) of the Act is not authority for revoking United's Seattle-Tokyo certificate if the public convenience and necessity is found so to require." United Brief to ALJ at 15, J.A. at 51 n. 3. The isolated references to section 401(g) do not change the fundamental character of the proceeding, viz., a comparative route case in which the Department was required to dispose of all applications within the time limits imposed by section 401(c).
 
 
 24
 We confronted an analogous problem in Delta Air Lines, Inc. v. CAB, 561 F.2d 293 (D.C.Cir.1977), cert. denied, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978). Northeast and Delta entered into a merger agreement, which was approved subject to the condition that Northeast's authority to operate a Miami-Los Angeles route would be stayed pending completion of a section 401(g) proceeding. In that subsequent proceeding, the ALJ awarded the route to Pan Am, and the CAB ultimately awarded it to Western. Delta petitioned for review, arguing that it was entitled to preferential treatment in the comparative proceeding. Delta argued that the route authority could not be awarded to a rival carrier until it was removed from Delta under section 401(g), and further contended that section 401(g) did not authorize such removal except for misconduct. We disagreed with the premise that the agency's action was taken under section 401(g). The Delta-Northwest merger was conditioned on a stay pending a fresh assessment of the need for competition and the relative merits of the various applicants. This condition was imposed under section 408, not 401(g). We recognized that the CAB, in approving the merger, had referred to a subsequent proceeding under section 401(g), but we concluded that the reference was mere surplusage:
 
 
 25
 Since we can discern no obvious interrelationship between Sec. 401(g) and Sec. 408(b) in the statutory scheme of the Federal Aviation Act, we see no reason why the Board could not have omitted mention of Sec. 401(g) altogether, and simply provided a brief description of the proceeding it proposed to conduct, pursuant to Sec. 408(b), in connection with the Delta-Northeast merger.
 
 
 26
 561 F.2d at 301-02.
 
 
 27
 Here, the DOT approved United's acquisition of Pan Am's routes subject to the condition that its authority to fly the Seattle-Japan route would be reevaluated in a "comparative selection case." PDT, 2 Av.L.Rep. (CCH) p 22,382, at 14,495. This case is even stronger than Delta because the DOT did not mention section 401(g) in the condition imposed in PDT, but only mentioned section 401(g) later in the order instituting the comparative proceedings. True, United's authority to fly the route was not stayed pending the completion of the comparative proceeding, as Delta's had been, but that does not in itself require that section 401(g) be applied. Although the PDT condition did not immediately divest United of its route authority, it substantially weakened its future interest in the route. The condition permitted the Department to subject United to a comparative route case in which the airline would not enjoy this incumbency advantage; if the DOT found another carrier to be superior, United's route authority would be deleted automatically. As we see it, the condition was imposed precisely to allow the DOT to avoid the usual procedure of deleting a current carrier's authority first and then choosing a replacement carrier.
 
 
 28
 The flexible procedure imposed in PDT is clearly permissible under Delta's reading of section 408. The DOT's current argument that it was required first to delete United's authority under section 401(g) makes it impossible to understand the PDT condition's purpose. The DOT has the authority under section 401(g) to initiate a proceeding to alter a certificate; it would not have insisted on a condition that added nothing to its pre-existing authority.
 
 
 29
 As we conclude that the DOT was not required and did not intend to delete United's authority under section 401(g) before it considered Continental's and American's applications under section 401(c), we do not pass on petitioner's alternative contention that section 401(g) does not authorize the Department to remove United's route authority except for misconduct not here present. Cf. Delta, 561 F.2d at 301 n. 8.
 
 2. Applicability of section 408
 
 30
 The dissent contends that neither sections 401(c) nor 401(g) apply. This proceeding was the result of the condition imposed in PDT under section 408. According to the dissent, Delta makes clear that section 408 permits the DOT to implement such innovative procedures free of the deadlines imposed by section 401(c).
 
 
 31
 We have two difficulties with this analysis. First, the DOT did not adopt this approach, either in the administrative proceedings or before this court. We may assume that the Department could have first determined whether United should keep the route and only then considered which of the competing carriers should receive it. The DOT might have summarily dismissed Continental's and American's applications as premature until it had completed its proceeding concerning United. See 49 U.S.C.App. Sec. 1371(c)(1)(C). But that was not the procedure that the DOT followed. It preferred to compare the merits of United, Continental, and American in a single comparative route case. The Department therefore set the applications of Continental and American for a hearing under section 401(c)(1)(A), which automatically triggers the deadlines of section 401(c)(2). The Department and the parties so viewed the matter, for as we have discussed above at 213-14, they consistently interpreted the deadlines of section 401(c) as applicable to this proceeding.
 
 
 32
 In requiring the Department to abide by the deadlines of section 401(c), we are not, as the dissent maintains, filling in a statutory gap. The Department chose to set Continental's and United's applications for hearing under section 401(c); having chosen that statutory route, it is bound by its deadlines. Moreover, the dissent does not accord sufficient deference to the Department's own interpretation of the Act. Although we think section 401(c) clearly requires these applications to be processed within its deadlines, if the statute is ambiguous, we must defer to the agency's reasonable construction. See above at 212-13. The DOT here construed the Act as requiring it to process the applications within the deadlines of section 401(c) (see above at 213-14), an interpretation we obviously find reasonable. As we have noted, the Department did not interpret the Act as the dissent does either in the administrative proceedings or before us.
 
 
 33
 Delta does not command a contrary result. As we have discussed above at 213-214, Delta concerned only the CAB's authority to revoke a certificate. It did not deal with the distinct question of the treatment of rival applications--applications that ordinarily must be processed according to strict deadlines imposed by Congress after Delta was decided.
 
 
 34
 Even if the DOT had intended to construct a unique section 408 follow-on proceeding not governed by the time limits of section 401(c), we doubt it could have escaped statutory deadlines altogether. Section 1010 of the Act requires the Department to issue "its final decision or order not later than the last day of the sixth month after submission" of an application under section 408. 49 U.S.C.App. Sec. 1490(1) (1982). See Braniff Master Executive Council v. CAB, 693 F.2d 220, 230 (D.C.Cir.1982) (when section 408 involved, agency must abide by six-month deadline). As United applied for authority to acquire Pan Am's routes by June 13, 1985, 2 Av.L.Rep. (CCH) p 22,382, at 14,465 n. 1, section 1010 required the Department to issue its "final decision or order" by December 13, 1985. If this proceeding were merely a part of the section 408 case initiated by United's application, then the DOT exceeded the statutory deadline.
 
 
 35
 No one suggested such a violation because the parties and the agency interpreted the approval subject to conditions imposed in PDT Order No. 85-11-67 as the final order, to be followed by a separate 401(c) proceeding. Otherwise, we would be left with a strange state of affairs: the Department must issue a final decision on applications under section 408 within six months, and on applications under section 401(b) within 330 days, but it may take as long as it likes to decide whether to remove a route from one carrier and award it to another as a result of a proceeding initiated under section 408 and coupled with applications for new authority under section 401(b). In sum, this case was governed by the section 401(c) time limits, even though it was the product of the condition imposed in PDT under section 408.
 
 
 36
 B. The Department Failed to Comply with the Requirements of Section 401(c)
 
 
 37
 1. Compliance with "congressional intent"
 
 
 38
 The DOT argues that its action was consistent with the intent behind section 401(c) because it did not implicate the concerns that motivated Congress in establishing the deadlines. Brief for DOT at 26-29. Whatever Congress' general motivation may have been, the statutory language must control:
 
 
 39
 The "plain purpose" of the legislation ... is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of problems Congress is called upon to address and the dynamics of legislative action.
 
 
 40
 Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986) (citation omitted).
 
 
 41
 The language of section 401(c) clearly demonstrates that Congress intended to mandate strict compliance with the time limits it specified. Within ninety days of the ALJ's decision, the DOT "shall make a final order"; if it fails to do so, the ALJ's decision "shall be transmitted to the President." 49 U.S.C. App. Sec. 1371(c)(2). Although in "extraordinary circumstances" the 150-day limit on the ALJ's decision may be extended by thirty days, 49 U.S.C. App. Sec. 1371(c)(4), no similar exception applies to the DOT's final decision. Resort to Congress' general purposes will not override its clearly expressed intent that the DOT follow the time limits or transmit the ALJ's decision.
 
 
 42
 2. The dismissal was not a "final order"
 
 
 43
 The DOT points out that section 401(c) requires only that the DOT issue a "final order" within ninety days, and claims that it complied with this requirement by issuing a final (i.e., appealable) order dismissing the proceeding. It denies that the "final order" must be "on the merits." Brief for Respondent at 31-32 & n. 42.
 
 
 44
 The first problem with this argument is that it was not the one the DOT adopted in its Final Order. There, it stated: "Viewed only as an application for new authority, section 401(c)(2) would require us to adopt the recommended decision [of the ALJ] and transmit it as our decision...." 2 Av.L.Rep. (CCH) p 22,424, at 14,744. It concluded, however, that section 401(g) and the APA overrode section 401(c). As we have concluded that 401(g) does not apply, the DOT appears to have admitted that it was required to transmit the ALJ's decision (or issue its own decision on the merits).
 
 
 45
 In any case, it is not clear that the DOT's current interpretation of the statute is permissible. We defer to the agency's interpretation only if the intent of Congress, expressed in the language, structure, and legislative history, is ambiguous. See above at 212-213. Here, the statute's structure strongly suggests that the DOT must either issue a decision on the merits (i.e., decide which, if any, carrier should be awarded the route) or transmit the ALJ's opinion. Section 401(c)(1) requires the DOT to decide, within ninety days, whether to set the application for a hearing, or dismiss it "on the merits." If the application is set for hearing, the ALJ must decide within 150 days, and the DOT within ninety days thereafter. It would be odd to require that the DOT's initial dismissal must be "on the merits," but to permit its decision following review of the ALJ to be not on the merits.
 
 
 46
 We also are concerned that the Department's current interpretation would permit it to circumvent the stringent time limits established by section 401(c). Under this view, the DOT could simply dismiss the application and restart the whole proceeding whenever it could not reach a final decision on the merits within ninety days of the ALJ's decision. Nor would judicial review of these dismissals effectively prevent circumvention of the statutory deadlines. If, as the DOT now suggests, the statute requires only a dismissal, then by what standard could we say that certain dismissals are permissible while others are not?
 
 
 47
 The agency has previously interpreted section 401(c)(2) to require a decision on the merits. In discussing the regulations implementing that section, the Deputy General Counsel wrote: "Congress has determined that the Board, first of all, must now dispose of all applications on the merits and, second, must do so within 11 months." 44 Fed.Reg. 11,36 4, 11,371 (1979). We give more weight to this contemporaneous interpretation than to the agency's current view. See Barnett v. Weinberger, 818 F.2d 953, 962 (D.C.Cir.1987).
 
 
 48
 The CAB adopted a similar view in the Wild Card Route Case, 85 C.A.B. 50 (1980). There, even though a party had improperly communicated ex parte with two Board members, the CAB issued its final decision on the merits. Although the Board was concerned about the effects of the ex parte contacts, the statutory time limits precluded it from resolving the issue in that opinion. Section 401(c) imposed an inflexible requirement that the Board issue a final decision within ninety days of the ALJ's decision. 85 C.A.B. at 67 & n. 40. The CAB did not dismiss the applications, as it did here, but proceeded to the merits. See also New Gateways to Brazil Case, 92 C.A.B. 545, 546 (1981) (although CAB would prefer to delay decision until conclusion of negotiations with Brazil, section 401(c) requires a final decision; Board therefore proceeds to merits).
 
 
 49
 3. Absent an adequate final decision, the DOT must forward the ALJ's decision
 
 
 50
 Certain intervenors argue that the statute contains an impenetrable ambiguity. Section 401(c)(2) provides that the DOT must issue a "final order" within ninety days of the "initial or recommended decision," or else the "initial or recommended decision" becomes final. As the SCO, who reviews the ALJ's decision, has "all the power" of the ALJ, 14 C.F.R. Sec. 302.22a(b) (1988), these intervenors suggest that the SCO's superseding opinion becomes the "initial or recommended decision."
 
 
 51
 In the first place, the DOT did not perceive this ambiguity. The agency thought it clear that if section 401(c) applied, it would have to act or forward the ALJ's decision. Final Order, 2 Av.L.Rep. (CCH) p 22,424, at 14,744. Second, the intervenors' interpretation is inconsistent with the plain meaning of the statute. Congress surely did not intend that the SCO have 150 days to review the ALJ's "initial or recommended decision," followed by another ninety days for the Assistant Secretary to review the SCO's decision. Third, the regulations clearly distinguish between the SCO's decision and the ALJ's decision, and only the latter is referred to as the "initial or recommended decision." For example, 14 C.F.R. Sec. 302.22a(b) distinguishes between the ALJ's "recommended decision" and the SCO's "final order." Similarly, 14 C.F.R. Sec. 302.1753(c) (1988), which deals with the "initial or recommended decision" of the ALJ, provides that it becomes the final decision unless exceptions are filed "or the DOT decisionmaker [here, the SCO] takes action to review."
 
 III. CONCLUSION
 
 52
 The DOT chose to conduct a comparative route case under section 401(c). Continental and American had a statutory right to a prompt decision on the merits of their applications, and the Department cannot escape this obligation by post hoc recharacterization of the nature of the proceedings. Nor are we persuaded that the Department's dismissal was a "final order" complying with section 401(c)(2). We grant the petition for review and order the DOT to transmit the ALJ's decision to the President pursuant to section 401(c)(2)(B).
 
 
 53
 SO ORDERED.
 
 GARTH, Senior Circuit Judge, dissenting:
 
 54
 I cannot agree with the majority's analysis, and hence, I dissent from its holding which directs the Department of Transportation ("DOT") to conform to the stringent time limits of Sec. 401(c)(2)(B)--time limits which have no application by statute, purpose or reason to a Sec. 408 "merger-condition."
 
 I.
 
 55
 In this case, United Airlines has been permitted to acquire the Pacific routes of Pan Am, subject to the condition, however, that if DOT deemed in a future proceeding that the public's interest would be served by authorizing another U.S. flag carrier to provide service, that United would be required to surrender its authority. Until that time, however, United could continue providing service from Seattle to Japan. The hearing that took place resulted in a recommendation by the ALJ to replace United in the Seattle-to-Japan service.
 
 
 56
 When this recommendation was reviewed by a Senior Career Officer ("SCO") in accordance with regulations, that officer reversed the order of the ALJ. The SCO then forwarded his opinion to the Assistant Secretary for policy and international affairs. The Assistant Secretary returned the opinion to the SCO for revisions to this opinion. It was at that point that the difficulty giving rise to this appeal occurred.
 
 
 57
 The Assistant Secretary, believing that the statutory deadline for the decision was September 18, 1987, directed that the corrections be completed by September 10, 1987. However, the SCO, because of a potential conflict in interest, was obliged to disqualify himself. Because the initial thought in the Department of Transportation (erroneous in my judgment), was that the time constraints of Sec. 401(c)(2)(B) controlled, DOT dismissed the applications before the purported deadline.
 
 II.
 
 58
 I cannot agree with the majority's analysis for a fundamental reason. Although the majority has implicitly acknowledged that no statutory provision of the Federal Aviation Act, 49 U.S.C.App. Sec. 1371 et seq., applies directly to the situation which we confront on this appeal, i.e., the time for decision of a merger with a subsequent condition (see e.g., maj. op. at 212-213), it has, nevertheless, by construing a statute out of its context, qualified the "merger-condition" circumstance by the time constraints applicable to proceedings conducted under Sec. 401(c). Proceedings under that provision, as I read it, pertain only to initial application proceedings and not to applications submitted in connection with a "merger-condition spin off" proceeding.
 
 
 59
 Further, in order to give meaning to its interpretation of Sec. 401(c), the majority opinion does not rely upon the plain meaning of the statute, Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), its express terms, id., nor on Congress' intent in enacting 401(c). Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Rather, it relies on what the parties and DOT purportedly "assumed,"[1] "thought,"[2] and "construed"[3] Sec. 401(c) to mean. Because I cannot agree that a statute's mandate can be derived from "assumptions," and "thoughts" of the parties who are affected and bound by its provisions, and because I am convinced that the resolution of this appeal is governed not by Sec. 401(c) but by prior precedent of this court and Sec. 408 of the Act, I am compelled to reach a different conclusion than the conclusion decreed by my brothers in the majority.
 
 III.
 
 60
 As the majority notes (maj. op. at 213-214), Delta Airlines, Inc. v. CAB, 561 F.2d 293 (D.C.Cir.1977), presented a situation analogous, if not controlling, to the one before us today. In Delta, the Civil Aeronautics Board ("Board") approved a merger between Delta Airlines ("Delta") and Northeast Airlines ("Northeast"). One of the issues presented by the Delta merger was whether the acquiring carrier, Delta, should be allowed to retain Northeast's authority to operate between Miami and Los Angeles. The Board conditioned approval of the merger on Delta's agreement to submit that route for review. The Board characterized this review as a proceeding under Sec. 401(g) of the Act, 49 U.S.C.App. Sec. 1371(g). That provision of the Act authorizes the Board (and now DOT) to "alter, amend, modify, or suspend any ... certificate, in whole or in part, if the public convenience and necessity so require...."
 
 
 61
 Soon thereafter, the Board initiated the Miami-Los Angeles Competitive Nonstop Case. The initiating order for that case stated that its purpose was:
 
 
 62
 to determine whether the public convenience and necessity require (a) the alteration, amendment, or modification of any carrier certificates so as to authorize non-stop service ... between Miami-Fort Lauderdale, Fla., and Los Angeles-Ontario-Long Beach, California, and (b) the alteration, amendment, or modification of Delta Airlines' certificate for [the Miami-Los Angeles route].
 
 
 63
 Delta, 561 F.2d at 297.
 
 
 64
 The language used in the initiating order for the Delta case yields two important considerations for the present case. The first point is that the Delta case, like the one before the court today, involved both the possibility of deleting a route from an airline's certificate of authorization and the possibility that the newly deleted route would then be awarded to another airline. Second, the Board and all the parties in the Delta case, very clearly characterized the proceeding as a proceeding pursuant to Sec. 401(g) of the Act.
 
 
 65
 Ultimately, the Board in Delta concluded that the route should not be transferred to Delta, but instead should be awarded to Western Airlines. Delta, in its petition to this court to review the Board's decision, presented two arguments. Delta first argued that the Board's order improperly transferred the route to Western because the transfer was effectively a revocation of Delta's certificate, and revocation under Sec. 401(g) requires a showing of an "intentional failure to comply" with applicable law. Such a showing, Delta argued, was not present in the record. Second, Delta argued that the Board's power under Sec. 401(g), to alter, amend, or modify certificates, did not extend to the elimination of an entire major route.
 
 
 66
 This court rejected both arguments. Essentially, the Delta court concluded that the proceeding was not a Sec. 401(g) proceeding; that it relied on the "merger-conditions" provisions of Sec. 408(b); and that that authority alone was sufficient basis for the Board's order. Indeed, the court, as we quote below, found no reason for the Board to have mentioned Sec. 401(g) at all, inasmuch as the controlling authority for the Board's action was found in Sec. 408(b).
 
 
 67
 Because of its pertinency to the instant appeal, I reproduce that portion of the Delta opinion which in my view should control the disposition in the instant case:
 
 
 68
 We reject both parts of Delta's argument for essentially the same reason. The Miami-Los Angeles Competitive Nonstop Case was not an ordinary Sec. 401(g) proceeding. Rather, it was convened in accordance with the Board's decision in the Delta-Northeast merger case. The Board's order instituting the Miami-Los Angeles investigation relied specifically not only on Sec. 401(g), but also on Sec. 408(b) of the Federal Aviation Act, 49 U.S.C. Sec. 1378(b) (1970).
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 [W]e need not evaluate Delta's contention that the Board's Sec. 401(g) power to alter, amend, or modify certificates does not embrace the prerogative to eliminate an entire major route from a carrier's authority. Even if Delta's points were well taken with respect to Sec. 401(g) proceedings generally, they completely ignore the fact that, under Sec. 408(b), the Board may approve a merger "upon such terms and conditions as it shall find to be just and reasonable...." In this case, one of the terms imposed was a de novo consideration of the Miami-Los Angeles route award originally made to Northeast in 1969. If such a proceeding does not fall neatly within the mold of the ordinary Sec. 401(g) proceeding, perhaps the Board should have been more circumspect about its use of the Sec. 401(g) label. Since we can discern no obvious interrelationship between Sec. 401(g) and Sec. 408(b) in the statutory scheme of the Federal Aviation Act, we see no reason why the Board could not have omitted mention of Sec. 401(g) altogether, and simply provided a brief description of the proceeding it proposed to conduct, pursuant to Sec. 408(b), in connection with the Delta-Northeast merger. While this may conceivably have been the preferable course for the Board to follow, its failure to do so did not prejudice Delta.
 
 
 72
 Id. at 301-02 (footnotes omitted).
 
 IV.
 A.
 
 73
 Given the Delta language quoted above and the Delta holding, I find no principled distinction between the Delta case and the present appeal. Delta stands for the principle that subsequent proceedings, held pursuant to a conditional approval of a merger, fall under Sec. 408, no matter how the parties, including the Board or DOT, attempt to characterize them.[4] Once this proposition is given due recognition, the flaw in the majority's argument becomes readily apparent: since this hearing was instituted pursuant to a conditional Sec. 408 approval, it was not an "application" proceeding, governed by Sec. 401(c) and thus, the time limits of Sec. 401(c)(2) were inapplicable.[5]
 
 
 74
 Moreover, I do not understand the majority's insistence on fitting this "spin-off" proceeding into a Sec. 401(c) box. Here, we are not faced with a case falling under either Sec. 401(c) or Sec. 401(g). While it is true Continental Airlines and American Airlines both "applied" for the Seattle-Japan route, and that their"applications" were consolidated with the instant proceeding, those "applications" were not typical of a Sec. 401 proceeding. An application for a route under Secs. 401(b) and (c) presupposes that such a route is available and is not assigned to another carrier servicing that route. In the instant case, no route was thus available, as United's authority to operate the Seattle-Japan route had never expired or been taken away. Indeed, United's authority was not scheduled to expire until April 1990. (A38). Furthermore, the impetus for this proceeding was not the Sec. 401 "applications" made by Continental and American. Rather, it was the condition attached to DOT's approval of the PDT case.
 
 
 75
 Nor does this proceeding "fall neatly within the mold of the ordinary Sec. 401(g) proceeding...." Delta, 561 F.2d at 301. First, as mentioned above, the genesis for this proceeding and the authority to conduct it, derived from the conditional approval granted in the PDT case, under Sec. 408. Second, the issues set for review by the conditional approval and the instituting order included far more than mere amendation of United's certificate to delete the Seattle-Japan route. Those issues involved: whether a primary and backup carrier should be authorized to fly over that route, and if so, under what terms or conditions. Neither of these concerns are covered by, or embraced within, Sec. 401(g).
 
 
 76
 In short, this case presents a circumstance where, although Congress has enacted time limits covering various types of DOT airline route proceedings, it has not addressed, and therefore has not established, a time limit for the type of "merger-condition" proceeding presented to the court today. Thus, Congress, by failing to foresee such a circumstance, has not spoken to the issue which we must resolve on this appeal. Accordingly, it is Congress' silence, and not the parties' assumption, with which we must contend.
 
 
 77
 Numerous distinguished jurists have written on the subject of legislative silence. For example, Judge Ruggero Aldisert of the Third Circuit has recently commented:
 
 
 78
 To be sure, it is often difficult to interpret that which the legislature intended to say, to interpret what may be called the unclear norm. Equally important is how to apply a statute to an aspect of a relevant problem when obviously, although covered by the statute, the specific problem clearly never occurred to the legislature at the time of the statute's enactment. This problem is not the problem of the unclear norm, but the problem of lacunae, of the nonexistent norm. Decades ago John Chipman Gray recognized the lacunae as a very serious problem:
 
 
 79
 The fact is that the difficulties of so-called interpretation arise when the legislation has had no meaning at all; when the question which is raised in the statute never occurred to it; when the question is not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present.
 
 
 80
 Plowden, in his note in Eyston v. Studd in 1574, made an observation that is in striking anticipation of modern principles of discerning the equity of a statute:
 
 
 81
 And in order to form a right judgment when the letter of a statute is restrained, and when enlarged, by equity, it is a good way, when you peruse a statute, to suppose that the lawmaker is present, and that you have asked him the question you want to know touching the equity; then you must give yourself an answer as you imagine he would have done, if he had been present.... And if the lawmaker would have followed the equity, notwithstanding the words of the law ... you may safely do the like.
 
 
 82
 Aldisert, Ruggero J., Philosophy, Jurisprudence, and Jurisprudential Temperament of Federal Judges, 20 Ind.L.J. 453, 508 (1987). (Footnotes omitted).
 
 
 83
 When faced with a similar problem, Judge Harold Leventhal of this court in addressing a similar situation occasioned by a gap in Congress' legislation stated:
 
 
 84
 So far as can now be gleaned from the briefs of counsel and our own researches, Congress did not expressly address itself to the issue of the applicability of the amended [statute to this issue.] The court is unable, then, to discern any specific legislative intent, one way or the other, as to the precise issue now before us.
 
 
 85
 That being the case, the court must discern the applicable legislative intent by what is necessarily an act of projection--starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before us.
 
 
 86
 Montana Power Co. v. Federal Power Commission, 445 F.2d 739, 746 (D.C.Cir.1970) (footnotes omitted).
 
 B.
 
 87
 My problem with the majority's approach in this case is that at no time has the majority attempted to discern what Congress would have intended, if faced with the problem with which Continental has presented us. Congress obviously never addressed such a problem and Congress has therefore enacted no "deadline" legislation requiring a definitive time period within which DOT must decide all terms of a previously imposed condition.
 
 
 88
 The majority opinion furnishes no adequate answer to this problem by its naked reference to Chevron, 467 U.S. 837, 104 S.Ct. at 2778, for the proposition that "... the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781-82; maj. op. at 212. Here, Congress just has not expressed itself. Nor am I persuaded by the majority's suggestion that we should look to DOT's interpretation of the Act and uphold it, if the interpretation is "permissible," Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, that is, "rational and consistent with the statute." NLRB v. United Food & Commercial Worker's Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 4221, 98 L.Ed.2d 429 (1987). Congress has not expressed itself as to any time limitations that would be applicable to "merger conditions" deadlines. The Congressional intent here is non-existent, not unclear or ambiguous. Indeed, Congress never even contemplated the issue giving rise to this appeal.
 
 
 89
 Additionally, in the cases cited by the majority to which the above-quoted language from Chevron would apply, the particular agencies involved had promulgated regulations pursuant to a Congressional enactment. Here, of course, no regulation has ever been promulgated. Thus, in the present case, we review the action of DOT taken in an absolute statutory void and absent Congressional expression of intent. I am therefore satisfied that those cases cited by the majority are inapposite.
 
 
 90
 Just as the legitimacy of an agency's regulations must be measured by some underlying Congressional authority, an agency's interpretation of a statute requires, as a threshold matter, that there be a statute or some other Congressional expression by which we can determine whether deference to the agency's interpretation must be afforded. Contrary to the majority's suggestion that we should defer to the DOT's interpretation of the Act, maj. op. at 215, I suggest that no such deference is required where Congress has enacted no legislation which the DOT could interpret, and which would permit us to defer to such an interpretation. The fact that DOT at one time erroneously assumed that it was engaged in a Sec. 401(c) proceeding--an assumption later rejected in its Final Order (A157)--cannot act as a duly enacted statute.
 
 
 91
 If, however, the majority is correct in deferring to DOT's expertise, and I am in error, at the least we should defer to DOT's most recent expressions. In DOT's Final Order, dated September 17, 1987 (A156), DOT stated "[a]s noted above, we believe that our obligations under Sections 401(c) and 401(g), through the APA, conflict. Our decision to dismiss this case is not based on an effort to avoid the requirements of the former but to comply with the requirements of the latter. Weighing the alternatives, we conclude that dismissal will cause the least violence to the objectives and policies of the Act." Id.
 
 
 92
 Additionally, in a post-argument letter report to the court dated July 5, 1988, DOT advised the court that after reinstitution of the Seattle/Japan proceeding on June 10, 1988, the ALJ has now recommended, contrary to the former recommendation in favor of Continental, that United Airlines retain the route. In its report, DOT also advised that "[a]lthough the Department adheres to its view that there is no statutory or regulatory deadline applicable to this case, the Department intends to issue its final decision no later than September 22, 1988." (Emphasis added).
 
 
 93
 In sum, if Congress failed to enact legislation providing for a deadline when conditions of a merger were to be decided, neither the agency nor the parties nor this court can overcome the absence of legislation based simply upon what the agency "thought," or what the parties "assumed" at the outset of the proceeding. Rather, we would have to discern the appropriate Congressional intent, an exercise which the majority opinion has assiduously avoided. We would do so, as Judge Leventhal advised, by "... starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before us." Montana Power Co., 445 F.2d at 746.
 
 
 94
 Moreover, the majority's reading of this court's Delta opinion does no more than "put the rabbit in the hat." The majority opines that Delta did not deal with the treatment of rival airline applications (a proposition that is dubious at best) and thus does not govern this case. Maj. op. at 214. By distinguishing Delta and therefore claiming that such applications must be processed according to strict deadlines, the majority has erroneously assumed that Delta has answered the very question with which we are confronted on this appeal, viz., whether Sec. 401(c) provides the deadline for deciding merger conditions such as those to which United Airlines is being held subject in this case.
 
 
 95
 If Congress had addressed itself to the situation before us, I believe that it would have had to balance, among other things, a number of considerations, including the extent of the conditions which DOT could impose, the type of hearing that might and probably would eventuate, the probability that circumstances not present in a Sec. 401(c) application might arise in a conditional "spin-off" context, and the need, if any, for a strict time limit in a situation where service on the route was continuing, pending approval and pending resolution of the reserved condition. Certainly, the parties' intent, or the parties' assumptions could bear little weight, if any, in such a calculus. Yet it is that intent and that assumption on which the majority relies and which forms the foundation of the majority's holding.
 
 
 96
 Thus, I believe that the proper form of analysis that is dictated, is for this court to determine what time limits, if any, Congress would have set for DOT determinations of a condition imposed pursuant to a conditional approval of a merger under Sec. 408. In short, we must guess what Congress would have intended on a point, not present to its mind, if the point had been present. See Aldisert, 20 Ind.L.J. at 508, supra.
 
 V.
 
 97
 As discussed earlier, the instant proceeding touches on some, but not all, of the characteristics of a Sec. 401(c) case and some, but not all, of the characteristics of a Sec. 401(g) case. Indeed, because the instant proceeding was governed by neither statute, it is at the intersection of both these two statutes that we must look for our instruction. Thus, in attempting to determine what Congress would have done had it addressed itself to the type of case with which the court is faced today, I am guided by Congress' enactments with respect to Secs. 401(c) and (g).
 
 A.
 
 98
 Section 401(c) sets up strict time limits for the processing of route applications. DOT must act upon an application, either by dismissing the application, starting summary procedures for its disposition, or by setting a date for a full public hearing, within 90 days after the application is filed. 49 U.S.C.App. Sec. 1371(c)(1). If DOT determines that the application requires full public hearing conducted by an Administrative Law Judge, the initial recommendation of the ALJ must be made within 150 days of the order setting the hearing date. DOT's final determination on the application must itself be made within 90 days after the issuance of the ALJ's recommendation. 49 U.S.C.App. Sec. 1371(c)(2). There is only one exception to these time limits: DOT may allow the ALJ an extra 30 days in extraordinary circumstances. 49 U.S.C.App. Sec. 1371(c)(4).
 
 
 99
 In stark contrast to the largely inflexible time constraints set forth in Sec. 401(c), Sec. 401(g) contains absolutely no time limits whatsoever. Thus, when DOT initiates proceedings, to alter, amend, modify, suspend, or revoke a certificate of public convenience and necessity, upon petition or sua sponte, it is free to take as much time as it deems necessary in order to reach its decision. The question then becomes: which of these approaches would Congress have adopted if it had considered the question of time restraints in the type of proceeding before the court today.
 
 B.
 
 100
 As noted previously, the aspects of this case which resemble a Sec. 401(c) proceeding are necessarily dependent upon those aspects of the case which involve a Sec. 401(g) proceeding, that is--there can be no route to apply for until a route has been made available by removing a route from United's certificate. Since a condition precedent for DOT's decision on a competing airline "application" (a decision for which Congress has set strict time limits under 401(c)(2)(B)) necessarily must subsume a decision on route deletion (a decision for which Congress has not set strict time limits), I am of the view that the same concerns that led Congress not to impose deadlines on Sec. 401(g) hearings must be operative here. Such concerns must precede the concerns which led Congress to impose deadlines in Sec. 401(c) cases. They must precede Sec. 401(c) considerations because, as noted, without a route deletion from an existing carrier's certificate, thus creating a "vacancy," no route would be available for which application may be made.
 
 
 101
 Moreover, in a Sec. 401(g) situation, service on the route is not only in place, but is a continuing service until supplanted. This is not the case in the Sec. 401(c) context. In the latter context, neither the route, nor the carrier, is certified (for that route) until authorized by DOT, and thus, no service for such a "new" route can occur until the chosen carrier commences its operations. By its very nature, therefore, the route is open and "up for grabs" when Sec. 401(c) applications are made. Thus, whereas a timely decision plays a critical role in having DOT choose between competing carriers when the route at issue is without service by any carrier--that same situation does not obtain where a Sec. 401(g) proceeding is at work. Hence, whereas a purpose exists for a time deadline in a Sec. 401(c) situation in order to provide service without undue delay, that purpose is not relevant in a Sec. 408 circumstance where service is existing and continuous.
 
 
 102
 Accordingly, because the "merger-condition" proceeding under Sec. 408, at issue here, involves a condition of service over an existing route by an existing carrier without the pressing need for new service on a new route by a new carrier, and because no statutory purpose has been shown to require a decision of DOT within rigid time deadlines, I would hold that no time limits constrain DOT's decision with respect to the instant proceeding.
 
 C.
 
 103
 This conclusion is reinforced by the circumstances presented in this case. Congress enacted the time limits of Sec. 401(c) in order to prevent the CAB from engaging in the practice of dismissing, or failing to rule on, route applications and then ultimately dismissing them as stale. But see H.Rep. No. 95-1211, 95th Cong., 2d Sess., reprinted in 1978 U.S.Code Cong. & Admin.News 3737-3740. But, in the present case no indication appears in the record that DOT has been less than diligent, or that DOT has dragged its feet, or that DOT has procrastinated with respect to deciding the reserved condition of the PDT merger. Quite to the contrary, each DOT hearing was timely scheduled and each review and determination was promptly made even though no statutory time limits were prescribed by Congress. The delay in deciding this case was not caused by DOT's lack of diligence, but rather it was caused by the unfortunate circumstance of the Senior Career Officer to whom this case was assigned, accepting employment with one of the parties, thereby causing his recusal and delaying DOT's ultimate decision. In short, when DOT dismissed the applications in order to reschedule the hearings on the reserved condition, it did so, not to delay, but because DOT found itself between "a rock and a hard place."
 
 
 104
 This is quite different from the concerns that led Congress to impose time limits on initial applications made pursuant to Sec. 401(c). By forcing this proceeding into Sec. 401(c) of the Act, the majority has extended and applied Sec. 401(c) time limits to a unique situation where Congress has provided no statutory time deadlines and where little utility or purpose has been demonstrated for establishing any such time limits.[6] Indeed, that may very well be the consequence of the majority's decision in this case, because by enforcing the deadlines of Sec. 401(c) in a Sec. 408 context, the majority has compelled DOT and the contesting carriers to accept the recommendation of the Administrative Law Judge, a recommendation which, I note, has been rejected by all subsequent levels of review.[7] (As previously noted at 215, supra, the reinstituted proceeding has resulted in an ALJ's recommendation that United Airlines retain the route rather than having the route awarded to Continental.)
 
 D.
 
 105
 Moreover, the majority, by substituting for the intent of Congress its own judgment on time limits in the "merger-condition" context, may have imposed strictures on DOT which thwart a balanced and deliberative approach to Sec. 408 decisions on mergers. If the conditions which DOT is authorized by statute to exact as part of a merger are to be limited by inflexible deadlines, I believe that such deadline decisions are best determined by Congress, or by a court upon a clear showing of congressional intent. Here, the majority has not documented any such showing that would permit a Sec. 401(c) deadline to be affixed to a Sec. 408 "merger-condition," and as Justice Stevens recently wrote in an analogous situation (liability of a manufacturer under contract with the government) where Congress had not spoken to the issue before the Court:
 
 
 106
 When judges are asked to embark on a lawmaking venture, I believe they should carefully consider whether they, or a legislative body, are better equipped to perform the task at hand. There are instances of so-called interstitial lawmaking that inevitably become part of the judicial process. But when we are asked to create an entirely new doctrine--to answer "questions of policy on which Congress has not spoken"--we have a special duty to identify the proper decision-maker before trying to make the proper decision.
 
 
 107
 "When the novel question of policy involves a balancing of the conflicting interests in the efficient operation of a massive governmental program and the protection of the rights of the individual--whether in the social welfare context, the civil service context, or the military procurement context--I feel very deeply that we should defer to the expertise of the Congress...."
 
 
 108
 Boyle v. United Technologies Corp., --- U.S. ----, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (Stevens, J., dissenting) (footnotes omitted).
 
 VI.
 
 109
 Because I believe that the reasoning of the Delta case provides explicit guidance here, and because I believe Congress would not have imposed the deadlines of Sec. 401(c) on this type of "merger-condition" case had it considered the issue, and because the majority has not even attempted to divine Congress' intention in the unique situation such as is presented here, I must respectfully dissent from the majority's analysis and holding. Accordingly, I would deny Continental's petition for review.[8]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 Maj. op. at 212
 
 
 [2]
 Id. at 210, 213
 
 
 [3]
 I question the majority's attribution to DOT that DOT "construed" that it was subject to 401(c)'s time limits. Maj. op. at 213. In its Final Order, DOT went to great pains to distinguish this unique proceeding which was initiated by DOT, from a Sec. 401(c) proceeding initiated by carrier applications. DOT concluded, therefore, that it was not subject to Sec. 401(c)'s statutory deadlines. (A157)
 
 
 [4]
 As I have previously stated in text, and as the Delta case makes clear, the parties' characterization of a proceeding is not binding upon a court. 561 F.2d at 301-02. Indeed, because under Delta, Sec. 401(g) is inapplicable in a "merger-condition" Sec. 408 proceeding, it is evident to me that DOT, by specifying Sec. 401(g) in its instituting order in the instant case, has failed to heed the instruction, if not the chiding, of this court in Delta. Id. at 302 & n. 10. There, this court stated that a "brief description of the proceeding it proposed to conduct, pursuant to Sec. 408(b)," would have been sufficient and that the Board should have been more "circumspect" about its use of the Sec. 401(g) label. Id. at 301, 302
 
 
 [5]
 The majority opinion (page 215) claims that even if DOT was conducting a Sec. 408 proceeding which would not be governed by the time limits of Sec. 401(c), it would nevertheless have been required to abide by a six (6) month deadline. However, the six-month time limit of Sec. 1010 of the Act, 49 U.S.C.App. Sec. 1490, is not applicable here. That provision requires DOT to issue "a final order or decision" approving a merger, in Sec. 408 proceedings within six months. That six-month provision, however, has no application to the conditions attached to the approval of a merger, which is the issue in this case. The Act does not establish a deadline for DOT's decisions respecting proceedings held to finalize conditions attached to mergers
 
 
 [6]
 I observe that in approving Sec. 408 mergers, DOT may well have to weigh a multitude of considerations and factors that may not be present in deciding Sec. 401 applications among competing carriers for routes. The record in this case is not developed with respect to such differences. However, given that there is no limit on the conditions that DOT may prescribe in order to approve mergers, it is immediately evident that the time limits established by Congress for one form of action by DOT might very well be inappropriate, and indeed, counter-productive for DOT action of a situation different in character. That is the very circumstance that I suggest obtains in the majority's effort to impose Sec. 401(c) deadlines on Sec. 408"merger-condition" decisions
 
 
 [7]
 In its Final Order, DOT recognized that a final decision by the ALJ on a reserved condition was undesirable by stating:
 ... it is the administrative agency's function, not an administrative law judge's to make the findings of fact and make the ultimate decision. Further, an agency must explain its final decision. In this case, the Department has neither completed its consideration of the exceptions to the judge's recommendations, nor ruled on their merits. Especially in the context of a deletion proceeding where significant property rights are at risk, the parties are entitled to a ruling on their exceptions.
 (A157).
 
 
 [8]
 Because I do not subscribe to the majority's analysis, I need not reach, nor address, the issue of whether DOT's action in dismissing Continental's application, constituted a "final order" under Sec. 401(c). See maj. op. at 216